**Reverse and Render; Opinion Filed August 6, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

---

### No. 05-14-00781-CV

---

### JERRY A. POWELL, M.D., Appellant
### V.
### ERIC KNIPP AND LAURA KNIPP, INDIVIDUALLY AND AS
### NEXT FRIEND OF THE MINOR, JAMES HELMUT KNIPP, Appellees

---

### On Appeal from the County Court at Law No. 5
### Dallas County, Texas
### Trial Court Cause No. CC-13-02581-E

---

## OPINION

Before Justices Bridges, Lang, and Evans
Opinion by Justice Evans

This is an interlocutory appeal from the trial court's order denying a government doctor's motion for summary judgment seeking the dismissal of a medical negligence claim against him under section 101.106(f) of the Texas Tort Claims Act. Eric Knipp and Laura Knipp, individually and as next friend of the minor, James, assert the borrowed employee doctrine precludes summary judgment. Because we conclude the summary judgment evidence conclusively established the doctor's right to dismissal under section 101.106(f), we reverse and render partial judgment as to the negligence claim.

## BACKGROUND

Jerry A. Powell, M.D. is a radiologist and a professor of radiology and was so employed in February 2011 by University of Texas Southwestern Medical Center. Powell's full-time

professorship with UTSWMC was his only source of salary and retirement benefits for the medical care and teaching services he provided. Powell provided health care to patients of Children's Medical Center pursuant to Children's agreement with UTSWMC. The contract between UTSWMC and Children's provides that Powell was not employed by, paid by, or subject to the control of Children's, but his health care services were provided to Children's patients at Children's facilities.

In late February 2011, Eric and Laura Knipp brought their son, James, to Children's emergency room where he was seen by Doctor William J. Morrissey for a cough and congestion.[1] Morrissey ordered a radiological study that was read by a doctor in residence, Gregory Paul King. Powell supervised King but was not at the hospital in the middle of the night when the events occurred. King detected indication of an old, healed rib fracture consistent with child abuse on the radiographic film. Morrissey sought the Knipps' consent for a full skeletal radiological exam to observe any indications of trauma or abuse. The Knipps reluctantly gave their consent. The additional radiological studies were completed yielding negative results for trauma or abuse, so the Knipps left with James. The Knipps allege their consent was obtained by Morrissey's promise that if the full skeletal radiological exam was negative for indications of trauma or abuse, no report would be made to child protective services. Notwithstanding the test results, a social worker at Children's reported an allegation of potential abuse of James to child protective services.

A few days later, a different doctor called to inform the Knipps that King had misread a congenital variant or defect as a rib fracture and that Children's medical records for James would be corrected regarding the reading of the film. When the Knipps obtained James's medical

---

[1] The factual summary regarding the treatment of the Knipps' son is based on the Knipps' allegations in their petition. The facts regarding Powell are summarized from his motion for summary judgment and the Knipps' response.

records, the interpretation of the radiological film did not appear to be clarified. Powell had signed the reports at issue. The Knipps continued to be concerned about the status of the child protective service's records regarding James. The Knipps do not allege they have ever been contacted by child protective services or that child protective services ever investigated the report from Children's.

The Knipps filed suit against Children's, Morrissey, Powell, and King. The Knipps claimed Powell was a borrowed servant of Children's and was professionally negligent which proximately caused them injuries and damages. In addition to unspecified damages, the Knipps pleaded for declaratory judgment relief. Powell filed an answer subject to a motion to dismiss. In his motion to dismiss, Powell alleged that because of his full-time employment with UTSWMC, he could not be sued individually. He asserted that pursuant to section 101.106(f) of the Texas Tort Claims Act, the Knipps had thirty days to add UTSWMC and must dismiss Powell from the lawsuit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f) (West 2011). The Knipps did not dismiss Powell or add UTSWMC and, for reasons not apparent from the record, the trial court did not rule on Powell's motion to dismiss.

Three months later, Powell filed a motion for summary judgment on the same basis as his motion to dismiss. Powell attached his affidavit to the motion in which he stated the facts about his employment with UTSWMC and lack of employment with Children's. Powell supported his affidavit with his 2011 IRS form W-2 showing he received salary and retirement plan contributions from UTSWMC and his Memorandum of Appointment with UTSWMC showing he was an assistant professor in radiology for "100%" of his time for the fiscal year September 1, 2010, through August 31, 2011. Also attached was a page from a contractual document he signed providing that other than exceptions not relevant here, all professional income he earned from a source other than UTSWMC was assigned to the "Institutional Trust Fund." Powell also

supported his motion for summary judgment with an affidavit from a UTSWMC human resources supervisor testifying that Powell was a full-time employee of UTSWMC during the relevant time.

The Knipps filed an amended petition in which they alleged that Powell was a borrowed employee of, and under the control of, Children's. A few days later, the Knipps filed their response to Powell's motion for summary judgment arguing that Powell was a borrowed employee of Children's such that Powell was not a governmental employee within the meaning of the Act's definition of employee. The trial court denied Powell's motion and he perfected this interlocutory appeal. *See Franka v. Velasquez*, 332 S.W.3d 367, 371 n.9 (Tex. 2011) (recognizing jurisdiction for interlocutory appeal brought by government employee-doctor for denial of motion for summary judgment based on section 101.106(f)).

## ANALYSIS

### A. Applicable Law

#### 1. Standard of Review

We review an appeal from summary judgment de novo. *See Cantey Hanger, LLP v. Byrd*, No. 13-0861, 2015 WL 3976267, at *2 (Tex. June 26, 2015). "By moving for summary judgment on section 101.106(f), defendants were asserting claims of governmental immunity." *Franka*, 332 S.W.3d at 371 n.9. A defendant moving for summary judgment on the affirmative defense of governmental employee sovereign immunity under section 101.106 must conclusively establish every element of that affirmative defense. *See Welch v. Milton*, 185 S.W.3d 586, 593 (Tex. App.—Dallas 2006, pet. denied). If the movant conclusively establishes the affirmative defense, the burden of production shifts to the nonmovant to raise a disputed fact issue on either an element of the movant's affirmative defense or an exception to that affirmative defense. *See Cunningham v. Tarski*, 365 S.W.3d 179, 186 (Tex. App.—Dallas 2012, pet. denied). To

determine if the nonmovant raises a fact issue, we review the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

## 2. *Dismissal Pursuant to Section 101.106(f)*

We analyze the application of section 101.106(f) to the claims in a lawsuit on a claim-by-claim basis. *See Tex. Dep't of Aging & Disability Servs. v. Cannon*, 453 S.W.3d 411, 416 n.10 (Tex. 2015) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 659 (Tex. 2008)). In order to obtain summary judgment pursuant to section 101.106(f), governmental employees must conclusively prove: (1) they are employees of a governmental unit, (2) the claims, if brought against their governmental employer, would fall within the ambit of the Act, (3) the claims against them are based on conduct generally in the scope of their governmental employment, and (4) the employees moved to substitute their governmental employer and to be dismissed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f); *Franka*, 332 S.W.3d at 385 ("[W]e hold that for section 101.106(f), suit 'could have been brought' under the Act against the government regardless of whether the Act waives immunity from suit."); *see also Cannon*, 453 S.W.3d at 416 (two elements of section 101.106(e)). To obtain dismissal, the governmental employee is not required to prove all the elements of an immunity defense. *See Franka*, 332 S.W.3d at 384–85 (history of amendments to Federal Tort Claims Act and Texas Tort Claims Act demonstrates substitution of governmental employer and dismissal of employee do not require proof conduct was discretionary or other elements of official immunity; just that conduct is within general scope of governmental employment). "Under the Texas Tort Claims Act, a person is not an employee of a governmental unit if the person performs tasks the details of which the governmental unit does not have the legal right to control." *Murk v. Scheele*, 120

S.W.3d 865, 866 (Tex. 2003) (internal quotation marks omitted). That is because "employee" is defined in the Act as "a person . . . who is in the paid service of a governmental unit by competent authority, *but does not include . . . a person who performs tasks the details of which the governmental unit does not have the legal right to control*." Tex. Civ. Prac. & Rem. Code Ann. § 101.001(2) (West Supp. 2014) (emphasis added).

**B.      UTSWMC's Legal Right to Control Powell is Dispositive Issue**

First, we analyze the Knipps' tort claim against Powell. *See Cannon*, 453 S.W.3d at 416 n.10 (governmental employee's entitlement to dismissal pursuant to section 101.106 properly analyzed on a claim-by-claim basis).

*1. Negligence Claim*

Powell moved for summary judgment on his right to dismissal under section 101.106(f) specifically citing the allegations against him that the Knipps pleaded relative to their claim for negligence.[2] In their amended petition, the Knipps added a section entitled, "Ultra Vires," in which they repeated their theory that because Powell was a borrowed employee of Children's, their claim is not brought under the Act. They further asserted that Powell does not have immunity, but did not seek any relief beyond recognition of their theory. In the trial court and on appeal, the Knipps challenge only the third element of section 101.106(f) as to their negligence claim. Thus, our analysis will likewise focus on that element, namely, by whom Powell was employed when he provided health care to James.

Powell's evidence is uncontroverted that he was "in the paid service" of UTSWMC and that all of his professional work, including his provision of health care to James, was within the scope of his contractual agreement with UTSWMC. As a matter of law, UTSWMC is a

---

[2] The Knipps also pleaded a claim for gross negligence alternately labeled as an intentional tort. In their amended petition, the Knipps omitted these allegations thereby nonsuiting such claims. *See FKM P'ship, Ltd. v. Bd. of Regents of Univ. of Hous. Sys.*, 255 S.W.3d 619, 632–33 (Tex. 2008).

"governmental unit" within the meaning of section 101.001(3) of the Act. *See Franka*, 332 S.W.3d at 373 n.15 (recognizing UTSWMC as a governmental unit under the Act); *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Loutzenhiser*, 140 S.W.3d 351, 354 n.5 (Tex. 2004) (same); *see also* TEX. EDUC. CODE ANN. § 65.02(a)(7) (West Supp. 2015) (University of Texas System includes the University of Texas Southwestern Medical Center at Dallas and its specified components); *id*. § 74.101 (West 2002) ("The University of Texas Southwestern Medical Center at Dallas is a component institution of The University of Texas System under the management and control of the board of regents of The University of Texas System.").

Powell's signed Memorandum of Appointment with UTSWMC provided that his appointment was "subject to the provisions of the Rules and Regulations of the Board of Regents of the University of Texas System, Regental and UT System policies, and the policies and procedures" of UTSWMC. The supreme court has concluded that medical faculty at other branches of the UT system who are subject to UT's regimens and review are governmental employees when the health care they provide is through another health care entity. *Murk*, 120 S.W.3d at 867. We conclude Powell met his summary judgment burden by proving his provision of health care to James was in the scope of his employment for UTSWMC, a governmental entity. *See Welch*, 185 S.W.3d at 593.

The Knipps contend their evidence raised a fact issue regarding Powell's status as a governmental employee. *See Cunningham*, 365 S.W.3d at 186. They argue Children's borrowed Powell from UTSWMC because Children's controlled Powell's provision of health care to James. Therefore, according to the Knipps, Powell is not covered by the Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(2). In support of their argument, the Knipps rely on a supreme court opinion deciding that, under some circumstances, a doctor can be a borrowed employee. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 543 (Tex. 2002).

A regular employee of an employer becomes a borrowed employee of another employer as to a task or activity for purposes of vicarious liability if the other employer has the right to direct and control the employee with respect to the details of the particular work at issue. *See Anthony Equip. Corp. v. Irwin Steel Erectors, Inc.*, 115 S.W.3d 191, 198–99 (Tex. App.—Dallas 2003, pet. dism'd). Which employer has the right to control the work or activity at issue determines whether an employee is a borrowed employee. *See Wolff*, 94 S.W.3d at 542 ("We have even gone so far as to say that the right to control remains the 'supreme test' for whether the master-servant relationship exists and thus whether the rule of vicarious liability applies.") (internal quotation marks omitted); *Heritage Hous. Dev., Inc. v. Carr*, 199 S.W.3d 560, 565 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("The test is whether the borrowing employer has the right to control the progress, details, and methods of operation of the work.").

The Knipps' theory assumes that if Powell was Children's borrowed employee, his status as a governmental employee is negated as to the same conduct. Powell responds that a borrowed employee can be the employee of both employers and that all his work was within the scope of his employment for UTSWMC. Citing *White v. Liberty Eylau School District*, 880 S.W.2d 156 (Tex. App.—Texarkana 1994, writ denied), Powell argues the borrowed employee doctrine is "irrelevant" to his employment status under the Act.

In *White*, a teacher employed by a school district also worked as a bus driver for a separate entity, the Bowie County School Transportation Department. While driving a bus, the teacher collided with the Whites' vehicle, and they sued for damages. The school district moved for summary judgment on the grounds that it could not be liable under section 101.021 of the Act[3] because the teacher was not its employee while driving the bus under the Act's definition of

---

[3] This section codifies the tort doctrine of *respondeat superior* liability with limitations. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (West 2011).

employee—the same definition that applies to Powell.[4] The trial court granted summary judgment to the school district, but the court of appeals reversed. The appellate court reasoned that a person may function as the employee of two employers at the same time and as to the same conduct, "if the service to one does not involve an abandonment of the service to the other." *Id*. at 159 (quoting RESTATEMENT (SECOND) OF AGENCY § 226 (AM. LAW INST. 1958)). The court of appeals determined there was summary judgment evidence that supported the plaintiffs' theory that the teacher was under the control of the school district even while she drove the bus under the control of the Bowie County School Transportation Department within the meaning of the Act's definition of employee.[5]

We decide based on *White* and the Restatement of Agency, that to negate Powell's status as an employee under section 101.001(2), the Knipps' evidence must raise a fact issue that the borrowing employer, Children's, controls Powell to the exclusion of UTSWMC's legal right to control Powell. Only if the governmental entity's control of its employee is negated would a borrowed employee come within the exception clause in section 101.001(2). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(2). We review the summary judgment record to determine whether the Knipps raised a fact issue that Powell was a borrowed employee of Children's to the extent that UTSWMC was deprived of the legal right to control Powell.

There is a presumption that an employee remains in his general employment as long as the employee is performing the work entrusted to him by the general employer, absent evidence

---

[4] The definition applicable to the *White* case was located in a different subsection but is essentially the same:

> [A] person, including an officer or agent, who is in the paid service of a governmental unit by competent authority, but does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the legal right to control.

*White*, 880 S.W.2d at 159 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(1) (Vernon 1986)).

[5] A jury subsequently found the teacher was not an employee of the school district in her conduct of driving the bus, a result affirmed by the court of appeals. *See White v. Liberty Eylau Indep. Sch. Dist.*, 920 S.W.2d 809 (Tex. App.—Texarkana 1996, writ denied).

to the contrary. *See Anthony Equip. Corp.*, 115 S.W.3d at 201. The supreme court has determined that a factor is a contract between the two employers allocating the right to control the employee, but that is not controlling. *Exxon Corp. v. Perez*, 842 S.W.2d 629, 630 (Tex. 1992). In the absence of evidence of control by the second employer or that the contract is a sham, the contract between two employers generally is determinative of the issue of control of the employee and the issue of borrowed employee. *Id.*; *see Producers Chem. Co. v. McKay*, 366 S.W.2d 220, 226 (Tex. 1963) ("When a contract, written or oral, between two employers expressly provides that one or the other shall have right of control, solution of the question is relatively simple."); *cf. Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 911 (Tex. App.—Fort Worth 2009, pet. denied) ("A contract expressly providing that a person is an independent contractor is determinative of the relationship absent evidence that the contract is a mere sham or subterfuge designed to conceal the true legal status of the parties or that the contract has been modified by a subsequent agreement between the parties."); *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 713 (Tex. App.—Fort Worth 2006, no pet.) ("A contract between the parties that establishes an independent contractor relationship is determinative of the parties' relationship in absence of extrinsic evidence indicating that the contract was a 'sham or cloak' designed to conceal the true legal relationship of the parties or that despite the contract terms, the true agreement vested the right of control in the principal.").

In *St. Joseph Hospital v. Wolff*, the supreme court examined the issue of borrowed employee status in the context of medical care by a physician. *Wolff*, 94 S.W.3d at 513. The court primarily relied on the contract between the hospital and teaching foundation but took into account the actual conduct of which one controlled the resident physician. *Id*. at 540–44. Further, the court recognized that a contractual provision allocating the right to control an employee can be dispositive where there is no conflicting evidence as to which entity had the

–10–

right to control the employee's task, but where the evidence conflicts with the contract, a jury must decide the disputed factual issue. *Id.* at 544 n.92 (citing *Perez*, 842 S.W.2d at 630). Accordingly, we begin our consideration of the Knipps' arguments by reviewing the contractual provisions regarding control of an employee, recognizing them generally as a determinative factor, but not to the exclusion of the other evidence in the record considered later.

The agreement between UTSWMC and Children's[6] provides that UTSWMC and its doctors are independent of Children's and are independent contractors, not employees, of Children's. For example, the agreement provides in section 10.4 that the UTSWMC physicians will make their health care decisions for patients completely independent of Children's:

> This Agreement contemplates nothing more than the delivery of certain services by UTSW through its Pediatric Faculty. *UTSW and its Pediatric Faculty shall remain entirely independent of Children's as to the diagnosis and treatment of patients* and all other medical, professional, and ethical affairs of UTSW and its Pediatric Faculty.

(Emphasis added). The agreement also provides in section 10.5 that the UTSWMC physicians are independent contractors and not employees of Children's:

> Independent Contractor Status. In performing its responsibilities pursuant to this Agreement, it is understood and agreed that UTSW and its Pediatric Faculty are at all times acting as independent contractors and that they are not partners, joint-venturers, or employees of Children's. The interest of Children's is to have the services contemplated by this Agreement performed and rendered in a competent, efficient, and satisfactory manner. It is expressly agreed that UTSW and its Pediatric Faculty will not for any purpose be deemed to be agents, ostensible or apparent agents, or servants of Children's and that this Agreement does not create any joint venture, joint enterprise, or partnership relationship between UTSW and its Pediatric Faculty and Children's, and the Parties agree to take any action that may be reasonably necessary to inform the public and patients of Children's that no such relationship exists.

---

[6] The agreement on its face indicates it is for the one-year period ending August 31, 2010. The agreement provides that it "shall automatically renew for additional one-year terms unless either Party provides to the other Party written notice of termination at least one year prior to the expiration of the initial term or any subsequent term." The parties treat the agreement as applicable to February 2011, and neither has provided evidence of notice of termination by the contracting parties.

The agreement provides that UTSWMC is obligated to pay its physicians their employment compensation and benefits while Children's is expressly not obligated to pay any physician for employment compensation or benefits. Generally, Children's and UTSWMC agreed Children's would not compensate UTSWMC for its physicians' professional services to patients as each party billed and collected for their own health care services provided to patients. But Children's agreed to pay UTSWMC for two types of work: (1) administrative work for participation in certain committees, and (2) undercompensated health care related to physicians providing full-time coverage for Children's hospitals and applicable to certain types of Medicaid-covered patients or billings. The health care provided to James did not fall into either of these two categories. By these terms, Children's agreement with UTSWMC clearly provides that physicians such as Powell remain employees of UTSWMC while rendering health care at Children's to Children's patients, the physicians make their health care decisions completely independent of Children's, and Children's, UTSWMC, and the physicians may take any reasonable action to inform the public.

James's medical records from Children's contain this disclosure:

NOTICE TO ALL PATIENTS

The physicians who treat you/your child at Children's Medical Center ("Children's") are not employees or agents of Children's. They are either (i) independent physicians engaged in the private practice of medicine who have staff privileges at Children's; (ii) independent physicians who are independent contractors and have staff privileges at Children's; (iii) *physicians employed by the University of Texas Southwestern Medical Center or another institution who have staff privileges at Children's*; or (iv) physicians participating in the care of patients as part of a post-graduate medical education program. As a result, you will be separately billed by the physicians for their services.

\* \* \*

IMPORTANT NOTICE: Patient acknowledges that a physician or other health care provider who may provide services to the Patient while at Children's may not be a participating provider with the same Health Plans as Children's. As a result, these physicians' services may not be covered by Patient's Health Plan (or may be

–12–

considered Out-of-Network). You may request information directly from the physician concerning the Health Plans with which the physician contracts.

I hereby acknowledge that I have read and I understand the above.

/s/ Eric Knipp 2-19-11

(Emphasis added). The above disclosure informed the Knipps that the physicians treating James at Children's were not employees or agents of Children's. This is the issue before us on this interlocutory appeal and it was clearly disclosed to the Knipps at commencement of James's treatment.

On the record before us, the conduct of UTSWMC and Children's comported with their agreement. There is no evidence in the record Powell obtained any directive from anyone at Children's as to how Powell was to perform his radiological tasks pertaining to James. As permitted in the last sentence of the "Independent Contractor Status" clause of the Agreement, Children's informed the Knipps that all the treating physicians at Children's were not employees of Children's and, further, that some physicians may be employed by UTSWMC with privileges to practice at Children's, which was the arrangement pertaining to Powell. Children's also informed the Knipps that because all the physicians were independent of Children's, the physicians may bill separately from Children's and might not be covered on the Knipps' health insurance in the same way as Children's. For James's care, the record indicates Powell billed for his professional services independently of Children's billings. All of this conduct by Powell, UTSWMC, and Children's was consistent with UTSWMC's agreement with Children's that Powell remained UTSWMC's employee and was not Children's employee when providing health care to James thereby indicating the agreement was not a sham or a subterfuge.

The Knipps contest the meaning and significance of these contractual provisions. First, the Knipps argue the sections of the agreement quoted above "do not state that UTSWMC has control over Dr. Powell's work at Children's, nor do they state that Children's does not have the

–13–

right to control Dr. Powell's work at Children's." We disagree. Section 10.4 clearly provides, "UTSW and its Pediatric Faculty shall remain entirely independent of Children's as to the diagnosis and treatment of patients . . . ." Section 10.5 provides in part, "UTSW and its Pediatric Faculty are at all times acting as independent contractors and that they are not partners, joint-venturers, or employees of Children's." These provisions clearly establish the faculty physicians such as Powell are independent of Children's in their diagnosis and treatment of patients. The subject of the allegation against Powell pertains to the alleged misdiagnosis of a congenital condition as a healed bone fracture possibly indicative of family violence. According to the agreement, Powell's diagnosis was "entirely independent of Children's" which goes to the central issue regarding whether Children's controlled Powell in making his assessment and diagnosis.

The Knipps also contend the signed disclosure is not determinative of who controlled Powell. Powell relies on the disclosure only to controvert Laura Knipp's contention that she was led to believe the doctors were employees of Children's and was never told they were not employees of Children's. We reference the disclosure merely because it is consistent with the agreement. Moreover, the disclosure's content directly negates "subterfuge designed to conceal the true legal status of the parties . . . ." *Farlow*, 284 S.W.3d at 911; *Bell*, 205 S.W.3d at 713. Although calling the document a signed consent, Powell does not argue, and we do not conclude, the signed disclosure in and of itself binds the Knipps to Children's agreement with UTSWMC. Rather, it is direct evidence that Children's and UTSWMC were not perpetrating a sham or subterfuge by the employment arrangement involving UTSWMC's doctors that work at Children's facilities.

The Knipps make a series of arguments that Children's controlled Powell's health care of James. First, the Knipps argue that Powell's supervision of King, an employee of Children's,

creates a genuine issue of material fact whether Children's had the legal right to control Powell's health care of James. The Knipps' argument inverts the test for borrowed employee. *Wolff*, 94 S.W.3d at 537. In *Wolff*, the supreme court reaffirmed the borrowed employee doctrine summarizing that the person whose work is controlled becomes the borrowed employee of the person or employer who exercised the control. *Id.* ("'One who would otherwise be in the general employment of one employer is a borrowed employee of another employer if such other employer or his agents have the right to direct and control the details of the particular work inquired about.'") (quoting STATE BAR OF TEXAS, PATTERN JURY CHARGES—MALPRACTICE, PREMISES & PRODUCTS 52.2 cmt. (1997)). The *Wolff* court decided that because "the Foundation or its [supervising physician] had the right to direct and control the details of [the resident's] medical treatment" of the plaintiff, then "regardless of any evidence that [the resident] was the general or regular employee of [the hospital in which treatment occurred and which employed the resident], he was acting as the borrowed employee of the Foundation as a matter of law when he treated [the plaintiff]." *Id.* at 542. If the premise of the Knipps' argument is correct—that Powell controlled King—then King would be a borrowed employee of UTSWMC, but Powell would not thereby become a borrowed employee of Children's. *See id.* We conclude there is no merit in this argument advanced by the Knipps and it does not present a disputed issue of fact.

The Knipps also argue a fact issue is created regarding Children's control of Powell because Children's scheduled Powell to work at the time James entered Children's and owned and controlled the facility, equipment, and computer software used by Powell to provide health care to James. The Knipps further argue Powell's notes appear under Children's letterhead. Finally, the Knipps assert that UTSWMC had agreed its pediatric faculty would timely make medical records and reports pertaining to their treatment of Children's patients using Children's software and facilities and such records would remain Children's property, unless otherwise

–15–

provided by law. The Knipps point out it was in these electronic medical records that the diagnosis of rib fracture was documented. They further assert Powell had an office at Children's, the Texas Medical Board Website lists Powell's primary practice address at Children's address, Powell used Children's reading room, and wore a lab coat and badge that had Children's name. The Knipps note that Powell's practice of medicine at Children's physical building, use of Children's equipment, software, and all the assets necessary to practice pediatric radiology at Children's, were done pursuant to the agreement between Children's and UTSWMC. But these facts do not contradict the evidence of Children's lack of control of the details of Powell's practice of medicine pursuant to the agreement. We conclude these arguments lack merit.

The Knipps next argue a fact issue regarding control of Powell is created because Children's billed for Powell's services and "ultimately" paid Powell's salary. Within this argument, the Knipps assert that Powell's address on the Knipps' health insurance company's explanation of benefits (EOBs) is the same as Children's address and that creates a fact issue regarding whether Children's billed for Powell's services. The Knipps rely on EOBs pertaining to services rendered to a member of the Knipps' household. The first EOB lists Powell as the provider at Children's street address, his tax ID, the insurer's plan ID number for Powell, his type ("Practitioner"), his specialty ("Pediatric Radiology"), and charges for health care services. A different EOB relied upon by the Knipps for Children's address identifies Children's as a different provider with a different tax ID, different insurer's plan ID number, different type ("Facility"), different specialty ("Acute Care General"), and different charges. These documents are direct evidence that Powell and Children's billed separately for their treatment of James. It was undisputed the health care provided to James occurred at Children's. We do not agree such information indicates Children's billed for Powell's services.

The Knipps also assert Children's "ultimately" paid Powell's salary, creating a fact issue about Children's control of Powell. The Knipps do not cite any authority, and we have found none, that considered compensation between the two employers attributable in some way to the benefit of the work received from the alleged borrowed employee in analyzing which employer controlled the employee. Nor do the Knipps explain how such transaction resulted in Children's controlling the details of Powell's work. We decide the Knipps' arguments about compensation do not raise a genuine issue of material fact regarding their theory that Children's controlled Powell.

The Knipps argue Powell's service on certain Children's committees called "Medical Leadership Positions" also raises a fact issue as to whether Powell was an employee of Children's. They contend UTSWMC was compensated by Children's for such service based on the individual doctor's base salary plus incentives. The Knipps also argue the agreement authorized Children's to remove any medical leader.

The agreement between Children's and UTSWMC provides that UTSWMC was obligated to provide doctors who would serve on various joint-entity committees. The doctor would do so as part of their employment for UTSWMC. For example, the agreement provides that the quality committees of Children's and UTSWMC may form a joint quality committee with which UTSWMC agreed its physicians would comply and participate by providing quality data and working together to improve quality. The Knipps do not explain how Powell's service on various administrative committees pursuant to the agreement resulted in Children's controlling the details of Powell's provision of health care to James. Powell's committee service is consistent with the agreement. More importantly, Powell's service on any committee is not the subject of this health care liability suit; rather it is the health care Powell provided to James that the Knipps must show Children's controlled. We therefore reject the Knipps' argument that

Powell's service on administrative and quality care committees demonstrates Children's control over Powell's health care provided to James.

The Knipps also contend Children's controlled the quality of Powell's work. To support their argument, the Knipps rely on certain provisions in section 9 of the agreement between Children's and UTSWMC in which UTSWMC agreed in section 9.1 that—

> UTSW . . . and all of its physicians and Medical Leadership Positions will comply with all applicable laws and regulations, accreditation standards, certification requirements, Children's Medical Staff Constitution, Rules and Regulations, Children's policies and procedures, and performance standards of The Joint Commission.

The Knipps also refer to provisions in section 9.2 in which UTSWMC further agreed—

> UTSW . . . will participate in Children's quality program, comply with Children's utilization review policies and guidelines, and ensure that its employed physicians participate in committees described in Children's medical staff bylaws.

After citing these provisions, the Knipps make a one-sentence argument: "Thus, Dr. Powell's treatment standard and methods were controlled by Children's Medical Center's rules, regulations, and performance standards."[7] The Knipps' argument does not explain how Powell's compliance with certain standards creates a fact issue regarding whether Children's controlled the details of Powell's health care provided to James. UTSWMC doctors, including Powell, participated on the quality of care committees and programs at Children's as part of their employment by UTSWMC. The Knipps do not supply the content of the Children's Medical Staff Constitution or explain how Powell's compliance with it demonstrates Children's controlled the details of Powell's provision of health care to James. We conclude Powell's, UTSWMC's, and Children's conduct is consistent with Children's and UTSWMC's agreement

---

[7] The Knipps add one sentence after this statement: "And more specifically, and most importantly, the very diagnosis at issue, the erroneous diagnosis of 'rib fracture,' was inserted into Dr. Powell's report by Children's." We have already resolved the Knipps' earlier argument about the software into which UTSWMC's doctors entered notes and diagnoses and do not understand how this sentence relates to the Knipps' compliance-with-standards argument. We decide this presents nothing for our review.

and does not create a genuine issue of material fact regarding Children's control of the details of Powell's provision of health care to James.

The Knipps contend Children's controlled Powell by controlling patient discharges and providing an incentive to UTSWMC if its doctors discharged patients by 9:00 a.m. But there is no showing that the document relied upon by the Knipps applies to Powell's pediatric radiological care of James,[8] and nothing in the record shows that Powell had anything to do with when James's medical treatment in the emergency room was complete. The Knipps' argument is essentially that Children's offered an incentive for an end time to Powell's work, but even setting a deadline for finishing work as a matter of law does not create a fact issue regarding whether Powell was a borrowed employee. *See Producers Chem. Co.*, 366 S.W.2d at 226 (trial court did not err in refusing borrowed employee issue in jury charge because "[m]ere directions given to [alleged borrowed employee] as to where to hookup, when to start and when to shut down the compressor in coordinating the work of all men and machinery on the project toward the ultimate object of unloading the hole does not raise the issue that right of control of [alleged borrowed employee] in the manner of performing his work had been transferred from" general employer to alleged borrowing employer); *Anthony Equip. Corp.*, 115 S.W.3d at 203 (as a matter of law "'mere directions' to [alleged borrowed employee] regarding where to place the crane and when to start and stop the crane during the truss lift in coordinating the two cranes in the truss lift" was no evidence of control). Even if the incentivized deadline applied to Powell, we conclude nothing about the program or a 9:00 a.m. target deadline for Powell's review of the radiographic images of James raises a fact issue about whether Children's controlled Powell.

---

[8] The record is not clear that the document relied upon by the Knipps pertains to patients treated in Children's emergency room who were never admitted to the hospital where they would occupy a bed.

Having reviewed all of the summary judgment record, we conclude the Knipps failed to raise a genuine issue of material fact on the issue of whether Children's controlled Powell's provision of health care to James. Powell, therefore, established as a matter of law his entitlement to dismissal regarding the Knipps' claim for negligence.

### 2. Declaratory Judgment Claims

We begin by noting Powell did not address the declaratory judgment allegations in his opening brief on appeal. *See* TEX. R. APP. P. 38.1(f) ("brief must state concisely all issues or points presented for review"). He first raised the issue in his reply brief. We liberally construe issues on appeal, but that does not include creating arguments that could have been raised in the opening brief but were not. *See Stovall & Assocs., P.C. v. Hibbs Fin. Ctr., Ltd.*, 409 S.W.3d 790, 802–03 (Tex. App.—Dallas 2013, no pet.). Issues raised for the first time in a reply brief are ordinarily waived and may not be considered by an appellate court. *Id*.

Further, Powell never challenged the declaratory judgment claims in his motion for summary judgment. Our review of the record reveals Powell never mentioned or referred to the declaratory judgment relief in his motion, nor did he assert the scope of the Act encompassed declaratory judgment claims.[9] As a result, we conclude the motion for summary judgment did not include a ground challenging the declaratory judgment claims, so the trial court's summary judgment order contains no relief or ruling regarding the Knipps' declaratory judgment claims.

---

[9] Powell's consistent reference throughout his motion is to the Knipps' negligence claim. Not until Powell's summary judgment reply in the trial court did he mention the Knipps' declaratory judgment claims and argue they fell within the scope of the Texas Tort Claims Act and Powell's right to be dismissed pursuant to section 101.106(f).

A summary judgment can be granted only on the grounds stated in the motion. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) ("a motion for summary judgment must itself expressly present the grounds upon which it is made"); *Garza v. CTX Mortg. Co., LLC*, 285 S.W.3d 919, 923 (Tex. App.—Dallas 2009, no pet.) (court does not "read between the lines" to determine grounds for summary judgment). "Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." TEX. R. CIV. P. 166a(c). A "ground" or an "issue" is a reason for granting or denying summary judgment. *McConnell*, 858 S.W.2d at 339 n.2. We consider Powell's argument in his summary judgment reply about whether the scope of the Act includes the specific declaratory judgment claims in this case to be a ground for summary judgment not included in his motion.

Absent a ruling, there is nothing for our review regarding the Knipps' declaratory judgment claims. We conclude Powell presented nothing for the trial court to decide or for us to review, so our opinion and judgment do not disturb the Knipps' declaratory judgment claims.

## CONCLUSION

We conclude the trial court erred by not granting Powell's motion for summary judgment to be dismissed as to the Knipps' negligence claim pursuant to section 101.106(f). Because the trial court's summary judgment order properly does not include a ruling on Powell's declaratory judgment claims, we leave undisturbed the Knipps' declaratory judgment claims which remain pending further proceedings in the trial court. We reverse the trial court's order denying summary judgment seeking substitution or dismissal pursuant to Texas Civil Practice and Remedies Code, § 101.106(f). We render judgment that the Knipps' negligence claim is dismissed as to Powell.



/ David Evans/
DAVID EVANS
JUSTICE


140781F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JERRY A. POWELL, M.D., Appellant

No. 05-14-00781-CV     V.

ERIC KNIPP AND LAURA KNIPP, INDIVIDUALLY AND AS NEXT FRIEND OF THE MINOR, JAMES HELMUT KNIPP, Appellees

On Appeal from the County Court at Law No. 5, Dallas County, Texas
Trial Court Cause No. CC-13-02581-E
Opinion delivered by Justice Evans, Justices Bridges and Lang participating.

In accordance with this Court's opinion of this date, we **REVERSE** the trial court's order denying appellant's motion for summary judgment or dismissal pursuant to Texas Civil Practice and Remedies Code, § 101.106(f). We **RENDER** judgment that the negligence claim against Jerry A. Powell, M.D. is **DISMISSED**.

It is **ORDERED** that appellant Jerry A. Powell, M.D. recover his costs of this appeal from appellees Eric Knipp and Laura Knipp, individually and as next friend of the minor, James Helmut Knipp.

Judgment entered this 6th day of August, 2015.