**Affirm and Opinion Filed January 23, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-19-00907-CV

## IN THE INTEREST OF H.B.C., A CHILD

**On Appeal from the 397th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. FA-17-1672**

# MEMORANDUM OPINION

Before Justices Myers, Molberg, and Carlyle
Opinion by Justice Molberg

In this parental rights termination and conservatorship case, we consider, among other basic and critically important questions, two affecting jurisdiction, namely: When does trial on the merits "commence" as that word is used in section 263.401 of the Texas Family Code, and did the court timely commence it here?

The Department of Family and Protective Services (the Department) filed this suit to terminate Father's and Mother's parental rights to H.B.C., their minor child. Maternal Grandmother intervened, seeking conservatorship of H.B.C. After a bench trial, the court terminated Father's and Mother's parental rights, found that it would be in H.B.C.'s best interest for the Department, not Maternal Grandmother, to be appointed as H.B.C.'s managing conservator, and dismissed Maternal Grandmother's request for conservatorship. Mother and Maternal Grandmother, but not Father, appeal.

For the reasons set out below, we overrule their issues and affirm.

# I. BACKGROUND

H.B.C. was born prematurely at twenty-five weeks' gestation in August 2016, when Mother was sixteen years old.[1] He spent the first five months of his life—until January 30, 2017—hospitalized in the neonatal intensive care unit (NICU).

The following October 18, when he was about fourteen months old, the Department[2] received a referral on H.B.C. about possible neglectful supervision because Mother was hospitalized in intensive care for a serious, ongoing heart condition and was unable to provide for him. During her hospitalization, Mother told the hospital staff that she had used methamphetamine in the prior week and that she was unable to care for H.B.C. because she was so ill and hospitalized.

Because of Mother's medical condition, hospital staff did not believe the Department's investigator should visit Mother in the hospital. The staff informed the Department of Mother's history, which included heart problems since she was a child.[3] Hospital staff stated Mother's heart was further weakened by the birth of H.B.C. and advised the Department that Mother was being evaluated for a ventricular medical device and was being considered for the transplant list.

### Department's Initial Attempts to Visit H.B.C.

Initially, it was unclear who was caring for H.B.C. in Mother's absence, but the Department finally determined that H.B.C. was with his Maternal Grandmother, and an investigator attempted to make contact with her. Hospital staff informed the Department that Maternal Grandmother was not cooperative and refused to speak to a social worker about anything related to Mother.

---

[1] Mother turned eighteen in February 2018.

[2] The Department of Family and Protective Services (DFPS) was Petitioner in the case below. Throughout the opinion, we use the Department to refer not only to DFPS but also to its Child Protective Services (CPS) division, as distinctions between the two are not important for our purposes here.

[3] Mother has a cardiac condition known as cardiomyopathy, which resulted from viral myocarditis at three months of age. Mother was to have cardiology appointments throughout her life, but her family was non-compliant with that directive.

For the first twelve days after the referral, Maternal Grandmother refused to allow the Department to make contact with her, H.B.C., or Mother. The Department investigator attempted to contact Maternal Grandmother several times, including through multiple home visits and numerous phone calls, but Maternal Grandmother refused to allow access to H.B.C.

Maternal Grandmother instructed the Department in writing not to contact her or Mother any further. As a result, a special investigator was assigned. Eventually, the special investigator spoke to Maternal Grandmother and was able to arrange access to H.B.C. through a home visit scheduled for October 20, 2017.

### Investigator's First Home Visit

When the investigator was finally allowed access to H.B.C. on October 20, 2017, she went to Maternal Grandmother's home, where H.B.C., Mother, and Maternal Grandmother lived. Mother, who had been released from the hospital the previous day, was asleep during that visit. Based on the information the hospital had provided the Department regarding Mother's heart condition, the investigator decided not to disturb Mother, fearing Mother might become "upset . . . enough that it would compromise her cardiac function."

During the visit, Maternal Grandmother informed the investigator that she was H.B.C.'s caregiver and had performed that role his whole life. Maternal Grandmother showed the investigator some paperwork, which she described as guardianship paperwork Mother had signed and notarized to name Maternal Grandmother as H.B.C.'s main caregiver and to allow her to obtain medical care and to otherwise provide for him. The investigator was shown H.B.C.'s crib, but Maternal Grandmother reported that H.B.C. slept with her most of the time.

Maternal Grandmother told the investigator that Mother had signed the paperwork placing H.B.C. in her care because Mother "just wasn't wanting to be a full-time parent" and was gone from the home much of H.B.C.'s life. The paperwork appeared to be a form or forms signed by

–3–

Mother and Maternal Grandmother but not filed with or endorsed by any authority, and the paperwork did not indicate there had been any court action giving Maternal Grandmother legal guardianship.

Maternal Grandmother also informed the Department's investigator that Mother had a history of drug use and was recently in the hospital. She said Mother had low cardiac function, had been having seizures, and had gone to several hospitals before being admitted to Medical City hospital. Maternal Grandmother indicated Mother was supposed to be on a list for a device for her heart (a left ventricular assist device) and that Mother's heart condition had existed since Mother was young, before Mother's drug use began.

During this first visit, the investigator saw H.B.C. and observed that he was "unable to sit up, unable to roll over, [and] wasn't holding his own bottle." The investigator noted H.B.C. "had significant delays for a 14-month old" and "a very misshapen head."

Maternal Grandmother said H.B.C. had multiple medical needs. She showed the investigator his discharge paperwork from the NICU, which listed many items needed in follow-up, including getting H.B.C. a cranial helmet. Maternal Grandmother confirmed that H.B.C. was supposed to have a helmet but that she had not followed up on that in the eight and one-half months since he was discharged.

The investigator talked with Maternal Grandmother about other needed follow-up care that had been indicated for H.B.C upon his discharge from the NICU. Maternal Grandmother told the investigator that H.B.C. "had a retinal problem, was blind in his left eye," and that it was recommended that he see an ophthalmologist, but she had not arranged for that. She also told the investigator H.B.C. had bilateral hernias and was to have surgery at a later time to have them repaired. She reported that H.B.C. had been on oxygen but was being weaned off.

She also told the investigator that H.B.C. had an enlarged liver, and doctors were not sure why, but that H.B.C. needed to have his blood drawn, which she planned to have done that day. Maternal Grandmother said that maybe once the blood work was done, H.B.C. could have the hernia surgery, "and maybe figure out what's wrong with his liver."

Maternal Grandmother also confirmed that H.B.C. needed occupational, physical, and speech therapy, but that she did not want "ECI . . . coming in her home."[4]  Maternal Grandmother denied this at trial.

When asked whether H.B.C. had a pediatrician, Maternal Grandmother responded that he did not "because he goes to so many specialists and they just take care of his needs."  Maternal Grandmother acknowledged to the investigator that H.B.C. was behind on one set of immunizations, and he had missed many of his medical appointments in the time since his discharge from the NICU.

The investigator became concerned for H.B.C.'s physical health and emotional well-being on her first visit because of H.B.C.'s many identified medical needs left unaddressed by Maternal Grandmother over a substantial time period.[5]  The investigator became more concerned, and her concerns were more pronounced, when she returned a second time that day.

---

[4] Neither counsel nor the witnesses defined ECI during questioning, but considering the context, the court presumes for purposes of this opinion that ECI refers to early childhood intervention, a program offered through the Texas Health and Human Services Commission for families with children from birth to age 3 who have developmental delays, disabilities or certain medical diagnoses that may impact development.  *See* Early Childhood Intervention Services, TEXAS HEALTH & HUMAN SERVICES, https://hhs.texas.gov/services/disability/early-childhood-intervention-services (last visited Jan. 16, 2020).

[5] Maternal Grandmother also had a history of not being responsive to Mother's medical needs relating to Mother's heart disease.

*Investigator's Second Home Visit*

The investigator left the home and returned to do oral swab drug tests on Maternal Grandmother and Maternal Grandfather.[6] She did these tests because Maternal Grandmother had a history of drug use documented in a previous case with the Department,[7] which, the investigator thought, might be involved in the situation involving H.B.C. She returned to the home the second time because she did not have the tests with her the first time she arrived. The oral swab drug tests the investigator provided are done in the home by the persons being tested, and they provide immediate presumptive results which are then confirmed in a lab.

After taking the test, Maternal Grandmother tested presumptively positive for the presence of amphetamine and methamphetamine. Maternal Grandfather tested presumptively negative for all substances. At trial, Maternal Grandmother denied any recent drug use. She said she had been drug free for eight years.

Maternal Grandmother also told the investigator she was on probation, did not want to mess that up, and consented to go for further testing that afternoon. She did not follow through. Eventually, she provided a negative drug test, but not on the day requested.

As a result of her visits, the Department investigator became concerned about H.B.C.'s safety in the home because of Maternal Grandmother's prior history with the Department, her

---

[6] Maternal Grandfather was in the home on the day of the visit but indicated he is an over-the-road truck driver who is gone for twelve to fifteen days at a time. He stated he had given his personal car to Maternal Grandmother to use for medical appointments.

[7] In prior proceedings not involving H.B.C., the Department investigated Maternal Grandmother's care and treatment of Mother and others, and as a result, the Department removed Mother and Mother's immediately older brother from Maternal Grandmother's home because of Maternal Grandmother's drug use and prior criminal activity involving her children. At the time of the investigator's first visit, Maternal Grandmother was on probation for a felony conviction of child endangerment because she sent her son to get marijuana for her. At the time of Maternal Grandmother's trial testimony, the son, now 21, was in prison for, among other things, manufacture and delivery of methamphetamine.

criminal history related to drug use, her failure to give H.B.C. the care he needed over the last nine months, and her neglect of Mother's own medical care.

### *Department's Removal of H.B.C. and Mother*

As a result of the visits, the Department removed H.B.C. from Mother and Maternal Grandmother's home with the assistance of local law enforcement and at least one emergency medical technician. Mother's vitals were taken before the Department removed her and H.B.C. When the Department informed Mother that H.B.C. was being taken into protective custody, Mother became upset and had a seizure. She was treated by medical personnel, and both Mother and H.B.C. were transferred to a local hospital for assessment.

The Department removed H.B.C. from Mother's care because she was too ill to provide for his care and because the caregiver she chose, Maternal Grandmother, had tested presumptively positive for amphetamine and methamphetamine on the oral swab drug screen.

Because she was a minor, Mother was also removed from Maternal Grandmother's custody, based on Mother's inability to care for herself, her medical condition, and Maternal Grandmother's failure to deal with Mother's medical needs.

### *Department's Lawsuit*

On October 23, 2017, three days after H.B.C.'s removal, the Department filed a petition requesting termination of the parent-child relationship between H.B.C. and H.B.C.'s parents and seeking managing conservatorship of H.B.C. The Department listed four grounds for termination, specifically, grounds in Texas Family Code sections 161.001(b)(1)(D), (E), (O) and (P), alleging Mother had:

(1) knowingly placed or knowingly allowed H.B.C. to remain in conditions which endangered H.B.C.'s physical or emotional well-being;

(2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child;

–7–

(3)    failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child; and

(4)    used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and (a) failed to complete a court-ordered substance abuse treatment program; or (b) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance.

TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O), (P).[8]

The day after the Department filed its petition, the trial court signed an "Order for Protection of a Child in an Emergency and Notice of Hearing," which set emergency temporary orders appointing the Department as H.B.C.'s temporary managing conservator, appointing an attorney ad litem for H.B.C., and scheduling a full adversary hearing.

### *Family Service Plans and Interactions with Caseworkers*

In November 2017, after Mother and H.B.C. were both removed from Maternal Grandmother's home, the Department assigned a caseworker to handle both cases.

Mother was initially placed in the care of an aunt but indicated to the caseworker shortly before she turned eighteen that she wanted to live with Maternal Grandmother. This alarmed the caseworker because Maternal Grandmother had not at that point had time to work on any of the services in her service plan, and because of the caseworker's observations regarding the duo's relationship. The caseworker testified that when she witnessed their interactions on the phone while Mother was living with her aunt, Mother would become very upset. The caseworker was concerned Mother would not do well if she returned to Maternal Grandmother's home.

---

[8] Significantly, in her appeal, Mother does not challenge the trial court's findings on any of these grounds.

Mother provided the caseworker with some information regarding her drug usage and personal history. She told the caseworker she had been using drugs since she was fourteen, including methamphetamine, cocaine, and heroin. She admitted to using methamphetamine as late as February 2018. She told the caseworker she went to school through about the sixth grade, stating that she believed she went on to the seventh grade but was not sure whether she completed it.[9]

Maternal Grandmother provided the caseworker with limited information about her own history, stating she had a substance abuse history about six or seven years earlier but not thereafter. She told the caseworker she was on probation, and she refused to discuss her history with the Department and told the caseworker she could just look it up. The caseworker looked up that history to determine why Mother had previously been removed from Maternal Grandmother, to see if Maternal Grandmother had completed services in those cases, and to see if there were ongoing concerns. The caseworker indicated Maternal Grandmother did not complete all of the services, had a history of methamphetamine use when her children were in her care, and had her children removed from her custody by the Department.

The caseworker developed family service plans for Mother and Father[10] in relation to H.B.C. and for Maternal Grandmother in relation to Mother. When the caseworker first attempted to give the family service plan to Maternal Grandmother, she refused to take the physical copy from the caseworker's hand. Maternal Grandmother did not complete the services on her plan. When she did go for a substance abuse evaluation, Maternal Grandmother denied use in several

---

[9] At trial, Mother testified she dropped out of school in seventh grade, partly due to her reading and writing deficits and because she was bullied in school. While she testified she has a problem with dyslexia, she also testified that before she was removed from Mother's care and placed into foster care when she was younger, she was one of the smartest kids in her grade and read all the time.

[10] The caseworker developed a service plan for Father and went over the plan with him in a visit with him in jail. Father was released from jail for a short period but was rearrested and returned to jail, and he did not complete any services. He testified at trial and stated he expected to be incarcerated through the end of 2019.

years, so substance abuse services were not offered by the facility that did the evaluation. Maternal Grandmother was also asked to do a mental health evaluation and at least one other item. She completed neither.

As part of Maternal Grandmother's service plan regarding Mother, the caseworker developed a safety plan that provided for a caseworker to count Mother's medication on a weekly basis. Maternal Grandmother only allowed her to count it once, and at other times, Maternal Grandmother refused to allow the caseworker access to her home and threatened to call the police. Even when the caseworker was allowed access to Mother, it was difficult for her to talk privately with Mother. On one occasion, Maternal Grandmother said she did not want to leave the room so that the caseworker could talk with Mother privately. The caseworker had concerns about Maternal Grandmother's care of Mother, including that she seemed to minimize Mother's drug use and did not seem to think Mother needed any substance abuse treatment or any support for drug use.

The caseworker reviewed Mother's family service plan with Mother while she was still in her aunt's home. As part of that plan, Mother was to maintain employment or work towards job training or a GED, maintain safe and stable housing, participate in substance abuse treatment and an anger management program, complete random drug testing and a parenting course, and follow advice from medical professionals and take her medication as prescribed. The caseworker believed Mother understood the services she was being asked to do, despite her limited education, and, initially, Mother agreed with the service plan and indicated that anger management services and counseling would be helpful.

Things changed, however, once Mother moved back in with Maternal Grandmother. It appeared Maternal Grandmother was interfering with Mother's services. The caseworker testified that at times when she tried to discuss services with Mother, Maternal Grandmother would tell

Mother not to speak to the caseworker and would say in front of Mother that Mother did not need any services. On one occasion, Mother said she wanted to do one of the services, and Maternal Grandmother said she did not believe Mother needed it.

Mother did not complete her services,[11] but she did initiate some of them prior to trial. Mother was seventeen when she went for a substance abuse evaluation. She would have been accepted into the program, but Maternal Grandmother said she needed to stay with her while she received services, and the program would not allow that due to confidentiality. To the caseworker's knowledge, after Mother turned eighteen, Mother did not attempt to go back for substance abuse services.

Based on the contact that the caseworker had with Maternal Grandmother, she did not feel Maternal Grandmother would be an appropriate caregiver for H.B.C. She concluded that Maternal Grandmother did not recognize the issues Mother was having and was not in agreement with getting help for Mother and that Maternal Grandmother had failed to get proper medical care for H.B.C. Moreover, when the caseworker talked with Maternal Grandmother about H.B.C.'s medical problems, Maternal Grandmother told the caseworker H.B.C. did not need a feeding tube, even though his team of doctors believed it was necessary. The caseworker was concerned that Maternal Grandmother would not care for H.B.C.'s medical needs if she were his caregiver, based partly on her comments regarding disagreements with doctors over Mother's care and based on her demonstrated failure to follow up with recommended medical care when H.B.C. was discharged from the NICU.

---

[11] The caseworker testified Mother did not do a psychological evaluation, did not follow up with the drug assessment other than as described above, did not do parenting counseling, and did not maintain stable housing.

***Mother's Testimony at Trial***

Mother was nineteen years old when she testified at trial on May 28, 2019. She admitted methamphetamine and cocaine use at age fourteen and heroin use at age sixteen. She last used heroin just before turning eighteen and used methamphetamine when she was eighteen. Mother testified she had been sober from methamphetamine use for five months and from heroin use for eight or nine months, although she had "slipped up once on each drug" after she experienced a miscarriage. She testified that although she was asked to go to drug treatment as part of her service plan, she never attended. She said she had tested negative on every random drug test for several months before she testified. She had begun parenting and anger management training by the time of trial, but had waited over a year and one-half to start those classes, even though they were part of her case plan. Mother attended only nine of a possible twenty-eight visits with H.B.C. while the case was pending and she admitted she missed some visits because of drug use. "I was young and I was on drugs. What more can I say? I was immature."

Mother testified that since the Department removed H.B.C. in October 2017, she had lived in multiple locations—including with Maternal Grandmother, with a friend, and out of state with her ex-fiancé—and was arrested and put on probation for assaulting Maternal Grandmother.

When asked about H.B.C.'s current medical issues, Mother could not answer and admitted she had the opportunity to visit with H.B.C.'s doctor and ask questions. Mother admitted leaving H.B.C. in Maternal Grandmother's care, said she would not know if Maternal Grandmother was not following through with H.B.C.'s appointments, and acknowledged she had people who could have taken her and H.B.C. to the doctor but she did not do so. She stated that she had given what she thought was temporary guardianship of H.B.C. to Maternal Grandmother, and when asked why she did that, she testified, "I figured it was in the best interest of my child for him to go . . . to go

to my mother because I was not a good version of myself. I wasn't doing good and making right decisions, and I could not take care of" him.

Mother admitted that she had been told to test H.B.C.'s blood sugar during visits with him but refused because she was scared, although she understood the importance of his medical care. She said she would work to overcome her fear.

Mother's progress on her service plan was minimal at the time of trial, although she pledged to do better over the coming six months. When asked what she wanted to have happen with H.B.C., Mother stated, to "go with my mother."

### Father's Testimony at Trial

Father was also nineteen years old when he testified at trial. Father had been out of H.B.C.'s life for most of his life and was incarcerated for most of that time. He stated none of his charges involved violence or child neglect.

Father believed he would likely continue to be incarcerated until the end of 2019. Father stated he had not paid child support for H.B.C. because he had not been asked to and in part because he had been incarcerated. Father had not completed any of the services in his service plan at the time of trial. Father testified that if the court did not allow H.B.C. to go home with Mother, he believed it was in H.B.C.'s best interest to be in the care of Maternal Grandmother.

### Maternal Grandmother's Testimony at Trial

Maternal Grandmother testified she did not think Mother could care for H.B.C. by herself. She admitted that while the Department had custody of H.B.C., Mother had left home to do drugs two or three times.

She was unemployed at the time of trial. She conceded that while she was in charge of caring for H.B.C., she did not take H.B.C. to an eye doctor, she had no reason to reschedule an appointment with his pulmonologist, and she had never obtained a pediatrician for H.B.C. She

also stated the Thrive Clinic[12] nearly killed H.B.C. by giving him an RSV and flu shot and testified that she believed her own research from the internet was more valid than that from the doctors treating H.B.C. She blamed the Department for H.B.C.'s need for a feeding tube and for the drug problems of her two youngest children who had been removed from her custody (one of whom was Mother), and suggested that the Department was setting her up in this case. She also testified that she believed the Department had taken H.B.C. in order to make money. Maternal Grandmother testified she thought H.B.C. would be better off financially, emotionally, and physically in her own home, with or without Mother.

### *Other Witnesses*

The trial court also heard testimony from various others, including a licensed chemical dependency counselor who testified that Maternal Grandmother had a history of substance abuse disorder at one time but was in "remission" of sorts and had a low risk of relapsing. He described her as a success story.

Two caseworkers from the Department testified.[13] One caseworker stated that at all times during her work on the case (November 2017 to June 2018), she believed it was in H.B.C.'s best interest for H.B.C. to stay with the foster mother with whom he had been placed. She also testified that at no point during that time period did she see enough progress from Mother, Father, or Maternal Grandmother to make her believe it was safe for H.B.C. to return to the care of any of them.

The other Department caseworker testified that she had been working on H.B.C.'s case since June 2018 and believed it was in H.B.C.'s best interest that Mother's and Father's parental rights to H.B.C. be terminated, that the Department be named as permanent managing conservator,

---

[12] The Department investigator described the Thrive Clinic as the clinic that follows up with premature babies.

[13] One caseworker worked the case from November 2017 to June 2018; the other worked the case from June 2018 until she testified at trial, about a year later.

–14–

and that Maternal Grandmother not be named managing conservator. She felt it would be a threat to H.B.C.'s health and well-being to be placed back in Maternal Grandmother's care.

A CASA supervisor and a CASA advocate both testified that they believed it was in H.B.C.'s best interest for Mother's and Father's parental rights to H.B.C. to be terminated and for H.B.C. not to be placed in Maternal Grandmother's care or for her to be given conservatorship.

### H.B.C.'s Condition After Removal

After H.B.C.'s removal from Maternal Grandmother, the Department placed H.B.C. in a therapeutic foster home, with a foster parent who has special medical training, is a licensed vocational nurse, and who works with children with chronic, complex needs. The CASA advocate who testified at trial described H.B.C.'s progress while in his foster placement as "phenomenal."

While there, H.B.C. began improving. He was now able to get into the crawl position, his mobility and medical care improved, he had begun occupational and speech therapy, and he had begun wearing the helmet to help reshape his misshapen skull.

At the time of trial, H.B.C. still had several medical conditions requiring him to see five or six doctors every three to six months and a medical specialist once or twice a month.

Among his many medical conditions, H.B.C. has a glycogen storage disease that requires him to be fed continuously through a gastrostomy tube (G-tube) in order to prevent hypoglycemia. This necessitates the infusion of 40 milliliters of feeding into H.B.C. through the G-tube every hour for eight hours during the night.

Pamela Rosen, a registered nurse overseeing H.B.C.'s foster care placement, testified she had no concerns about the care H.B.C. was currently receiving, but if the care he was receiving stopped, it would be detrimental to his health and well-being. Rosen also expressed concerns about a caregiver who believed she knew better than a doctor, had doubts that the glucose issue was real, and had a pattern of not following up with recommended medical care.

## II. Issues

We consider three main issues below:  first, whether the court timely commenced trial on the merits under Texas Family Code section 263.401; second, whether the trial court erred in finding it was in H.B.C.'s best interest to terminate Mother's parental rights; and third, whether the appointment of the Department, not Maternal Grandmother, as H.B.C.'s managing conservator was in H.B.C.'s best interest.

## III. Standard of Review

The Department's claims for termination of Mother's parental rights and Maternal Grandmother's claim for conservatorship of H.B.C. were tried together in a bench trial.  Following the trial, the court made the necessary findings to terminate, and did terminate, Father's and Mother's parental rights.  The order of termination also found it was not in H.B.C.'s best interest for Maternal Grandmother to be appointed as managing or possessory conservator, and that it was in H.B.C.'s best interest that the Department be named as H.B.C.'s sole permanent managing conservator.

A court may terminate a parent-child relationship upon a finding supported by clear and convincing evidence that (1) the parent engaged in an act prohibited by section 161.001(b)(1) of the Texas Family Code and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Though grounds-for-termination evidence may be probative of both issues, as it is here, each issue must be proven, and proof of one does not relieve the burden of proving the other. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).  We strictly scrutinize termination of parental rights proceedings and require clear and convincing evidence in support.  *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  "Clear and convincing evidence" is defined by the Texas Family Code as that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief

or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *see also In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam).

When a trial court terminates the parental rights of both parents, as the court did below, the court must appoint "a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a). Maternal Grandmother seeks managing conservatorship of H.B.C. in this case.

Unlike termination decisions, conservatorship decisions must be proved by a preponderance of the evidence. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); TEX. FAM. CODE § 105.005 ("Except as otherwise provided by this title, the court's findings shall be based on a preponderance of the evidence."). These differing standards of proof affect our appellate review, and our review is more stringent for termination decisions than for conservatorship decisions. *In re J.A.J.*, 243 S.W.3d at 616.

We review a conservatorship determination for an abuse of discretion, reversing only if we determine it was arbitrary or unreasonable. *Id.*; *In re N.T.*, 474 S.W.3d 465, 479 (Tex. App.—Dallas 2015, no pet.). Legal and factual sufficiency issues are not independent grounds of error in conservatorship proceedings but are relevant in considering whether an abuse of discretion occurred. *In re L.W.*, No. 02-16-00091-CV, 2016 WL 3960600, at *2 (Tex. App.—Fort Worth July 21, 2016, no pet.) (mem. op.). In deciding whether an abuse of discretion occurred, we consider whether the court (1) had sufficient evidence upon which to exercise its discretion and (2) erred in its exercise of that discretion. *Id.* We apply the applicable sufficiency review on the first question, and on the second, we consider whether, based on the evidence, the trial court made a reasonable decision. *Id.*

When reviewing legal sufficiency issues, we look at the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a

reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re I.S.*, No. 05-19-00709-CV, No. 05-19-00711-CV, 2019 WL 6696037, at *7 (Tex. App.—Dallas Dec. 9, 2019, no pet. h.) (mem. op.) (citing *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018)); *see also In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding, if a reasonable factfinder could have done so, and disregard all evidence a reasonable factfinder could have disbelieved or found to be incredible. *In re J.F.C.*, 96 S.W.3d at 266. Ultimately, the final test for legal sufficiency is always whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *In re S.V.*, No. 05-18-00037-CV, 2019 WL 516730, at *7 (Tex. App.—Dallas Feb. 11, 2019, no pet.) (mem. op.).

For factual sufficiency review, we weigh disputed evidence contrary to the finding against all the evidence favoring the finding and consider whether disputed evidence is such that a reasonable factfinder could have resolved the issue in favor of the finding. *In re I.S.*, 2019 WL 6696037, at *7 (citing *In re A.C.*, 560 S.W.3d at 631). Evidence is factually sufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is not so significant as to keep the factfinder from forming a firm belief or conviction that the finding was true. *In re I.S.*, 2019 WL 6696037, at *7 (citing *In re A.C.*, 560 S.W.3d at 631). We have also observed:

> In a bench trial, the trial court is in the best position to observe and assess the witnesses' demeanor and credibility, and to "feel the forces, powers, and influences" that may not be apparent from merely reading the record on appeal. *Niskar v. Niskar*, 136 S.W.3d 749, 753 (Tex. App.—Dallas 2004, no pet.); *see also In re S.V.*, 2019 WL 516730, at *7 (noting appellate court must be "mindful that the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony"). "As a result, an appellate court defers to a trial court's resolution of underlying facts and to credibility determinations that may have affected its determination, and will not substitute its judgment for that of the trial court." *In re J.R.P.*, 526 S.W.3d 770, 778 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

*In re S.G.C.-G.*, No. 05-18-00223-CV, 2019 WL 1856621, at \*5 (Tex. App.—Dallas Apr. 25, 2019, no pet.) (mem. op.).

We review matters of statutory construction de novo, "ascertaining and giving effect to the Legislature's intent as expressed by the plain and common meaning of the statute's words." *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex. 2007). We give effect to every word, clause, and sentence and apply the plain meaning of the statutory text, unless a different legislative definition is supplied, a different meaning is apparent from the context, or the plain meaning leads to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008); *In re Echols*, 569 S.W.3d 776, 779 (Tex. App.—Dallas 2018, orig. proceeding [mand. denied]).

## IV. ANALYSIS

### *Dismissal Deadline and Commencement of Trial Under Section 263.401(a)*

In their first issues, both Mother and Maternal Grandmother argue that the trial court did not commence trial on the merits on January 28, 2019 and thus failed to meet the automatic dismissal deadline in Texas Family Code section 263.401(a). Because this case was filed on October 23, 2017, we apply the amendments to section 263.401(a) that took effect on September 1, 2017. *See In re M.M.*, No. 05-19-000329-CV, 2019 WL 4302255, at \*2 (Tex. App.—Dallas Sept. 11, 2019, pet. denied) (mem. op.) (citing *In re T.W.*, 557 S.W.3d 841, 843 n.2 (Tex. App.—Amarillo 2018, pet. denied). The pertinent text in those amendments states:

> Unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b–1), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, ***the court's jurisdiction*** over the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child ***is terminated*** and the suit is ***automatically dismissed*** without a court order.

*See* Act of May 26, 2017, 85th Leg., R.S., ch. 317, § 27, 2017 Tex. Gen. Laws 612, 620; Act of May 28, 2017, 85th Leg., R.S., ch. 319, § 12, 2017 Tex. Gen. Laws 713, 718–19 (emphasis added).[14]

Thus, although this was not originally true,[15] for cases filed on or after September 1, 2017, the dismissal deadline in Section 263.401(a) is jurisdictional, and if the court fails to meet it, dismissal is automatic. *See* TEX. FAM. CODE § 263.401(a), (c); *In re M.M.*, 2019 WL 4302255, at *3.

In this case, section 263.401(a) required the trial court to commence trial on the merits within approximately one year[16] after the trial court rendered its order appointing the Department as temporary managing conservator of H.B.C., unless because of certain "extraordinary circumstances" the court extended the deadline by no more than 180 days, as it did here. *See* TEX. FAM. CODE § 263.401(a), (b); *In re M.M.*, 2019 WL 4302255, at *2.

Here, the day after the Department filed its petition on October 23, 2017, the trial court signed an "Order for Protection of a Child in an Emergency and Notice of Hearing" that appointed the Department as H.B.C.'s temporary managing conservator, appointed an attorney ad litem for H.B.C., and scheduled a full adversary hearing. On November 2, 2017, the court signed a

---

[14] The legislature passed two amendments to section 263.401(a) in 2017, and the language quoted above is the same in both amendments. The only difference between the amendments with respect to 263.401(a) is that the earlier of the two (H.B. 317) also includes another sentence at the end of the quoted paragraph, while the later amendment (S.B. 319) does not. *See* Act of May 26, 2017, 85th Leg., R.S., ch. 317, § 27, 2017 Tex. Gen. Laws 612, 620; Act of May 28, 2017, 85th Leg., R.S., ch. 319, § 12, 2017 Tex. Gen. Laws 713, 718–19. The sentence included in the House bill but not included in the Senate bill states, "Not later than the 60th day before the day the suit is automatically dismissed, the court shall notify all parties to the suit of the automatic dismissal date." *See* Act of May 26, 2017, 85th Leg., R.S., ch. 317, § 27, 2017 Tex. Gen. Laws 612, 620. Because that sentence is not at issue here and is not important to our analysis, we did not include it in the quoted language above. Although the legislature amended section 263.401 again in 2019, those amendments did not alter the language quoted above or referenced herein. *See* Act of May 22, 2019, 86th Leg., R.S., ch. 783, §§ 1–3, 2019 Tex. Gen. Laws 2227, 2227–28. Thus, even if this suit had been filed on or after September 1, 2019 (the effective date of the 2019 amendments), our analysis here would remain the same.

[15] *See In re M.M.*, 2019 WL 4302255, at *2 (citing *In re Dep't of Family & Protective Servs.*, 273 S.W.3d 637, 641–42 (Tex. 2009) (orig. proceeding)).

[16] Unless properly extended, the dismissal deadline is "on the first Monday after the first anniversary of the date" the court rendered a temporary order appointing the Department as temporary managing conservator. TEX. FAM. CODE § 263.401(a).

"Temporary Order Following Adversary Hearing," appointing the Department as H.B.C.'s temporary managing conservator. The court set, then later reset, the permanency hearing and gave notice that the dismissal date was October 29, 2018.

On October 15, 2018, the court signed an "Order for Extension of Dismissal Date" under family code section 263.401(b), and the dismissal date was moved to January 28, 2019, a date less than 180 days after the initial dismissal deadline. The appellate record reflects trial proceedings occurred on January 28, 2019, May 28, 2019, June 20, 2019, and July 8, 2019.

At issue here is whether trial on the merits did, in fact, commence on January 28, 2019, within the meaning of the statute.

On January 28, 2019, the extended dismissal date, the court called the case to trial, received announcements of ready from counsel for the Department, Mother, Maternal Grandmother, and the attorney ad litem, considered various pretrial matters raised by the parties' counsel who were present, swore in a witness, was asked to invoke the rule, and received brief testimony from one of the Department's witnesses before trial was recessed.[17]

Based in part on Father's and his counsel's absence and on the limited nature of the testimony presented on January 28, 2019, Mother and Maternal Grandmother both argue that a merits trial did not commence on that date, but instead commenced on May 28, 2019, when the proceedings resumed and more extensive testimony was taken. Because the latter date occurred after any statutorily permissible extended dismissal date, Mother and Maternal Grandmother argue the trial court automatically lost jurisdiction under section 263.401(a) and that the order of

---

[17] On January 28, 2019, Father made no appearance or announcement on his own or through counsel. The trial court noted Father's absence, and counsel for Mother and the attorney ad litem both informed the court that Father was currently in prison. The Department's counsel also informed the court that Father's attorney had prior medical appointments that could not be rescheduled that day but had no objection to beginning trial that day.

termination is therefore void and must be reversed. The Department argues trial on the merits commenced on January 28, 2019.

As support for their differing positions, Mother, Maternal Grandmother, and the Department each cite *In re D.S.*, 455 S.W.3d 750 (Tex. App.—Amarillo 2015, no pet.). Mother and Maternal Grandmother also rely on *In re P.M.W.*, 559 S.W.3d 215 (Tex. App.—Texarkana 2018, pet. denied), and the Department points us to *In re R.F., Jr.*, No. 04-17-00582-CV, 2018 WL 1308542 (Tex. App.—San Antonio Mar. 14, 2018, no pet.) (mem. op.) to support its position. To our analysis we add *In re R.J., Jr.*, 579 S.W.3d 97 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

*In re D.S.*, a parental rights termination case, offers no support for Mother and Maternal Grandmother's position here. Instead, it supports the Department. There, the trial court merely "called the attorneys representing the parties to the bench . . . [and] made inquiry into the length of time a trial would take." 455 S.W.3d at 752. Once informed, the trial court recessed the proceedings and told counsel "to obtain a subsequent trial date from the court coordinator. *Id*. In contrast to the facts here, in *In re D.S.*, no readiness announcements were made, pre-trial matters addressed, witnesses sworn, or testimony taken—matters the appeals court indicated would have changed its resolution had they taken place. *Id*. Against this background, the court concluded that such "a putative call of the case and an immediate recess" was not commencing a trial on the merits within the meaning of the statute. *Id*. at 753.

*In re P.M.W.*, an ineffective assistance of counsel case, noted that it "is factually distinguishable from *[In re] D.S.* because [in *In re P.M.W.*] the trial court heard the parties' announcements, swore in one witness, and had the witness answer one question before recessing the case." 559 S.W.3d at 221. Nevertheless, the appellate court declined to answer the question of when trial on the merits commenced under the statue in the context of that appeal. *Id.; see also*

*In re D.I.*, No. 12-16-00159-CV, 2016 WL 6876503, at \*5 (Tex. App.—Tyler Nov. 22, 2016, no pet.) (mem. op.) (same); *G.M v. Tex. Dep't of Family & Protective Servs.*, No. 03-15-00825-CV, 2016 WL 3522131, at \*2–4 (Tex. App.—Austin June 23, 2016, no pet.) (mem. op.) (same). *In re P.M.W.* is no assistance to Mother or Maternal Grandmother here.

*In re R.F., Jr.*, on the other hand, fully supports the Department's argument that the trial court commenced trial on the merits on January 28, 2019 and did not lose jurisdiction. There, on the date in question, the trial court asked if the parties were ready to proceed to trial. Father replied no and filed a motion for continuance and, alternatively, a motion to dismiss. The trial court denied the motions and proceeded to trial without additional objection from Father. The Department called its first witness, a caseworker, who testified briefly before the trial court recessed. 2018 WL 1308542, at \*1. The appellate court found this sufficient to establish that the trial court timely commenced the trial on the merits and did not lose jurisdiction of the case under family code section 263.401(a). *Id.*

Finally, *In re R.J., Jr.*'s analysis is particularly instructive. In that case, the trial court called the case to trial, swore in witnesses, obtained announcements of "ready" from various individuals or counsel (Department's attorney, Mother's and Father's attorneys, the child's ad litem, a child advocate guardian ad litem from CASA, and would-be intervenors), and heard testimony from the Department's first witness, a caseworker, who briefly testified before the court recessed. 579 S.W.3d at 110. The court concluded this was sufficient to establish that trial on the merits commenced by the deadline required by the family code. *Id.*

Here, there is no suggestion that the actions of the trial court and counsel on January 28, 2019, were merely perfunctory, feigned or superficial, undertaken solely or primarily for the purpose of avoiding an automatic statutory dismissal. Nor do we need to decide whether any lesser, more limited actions than those that occurred here might have constituted a commencement

of trial on the merits on January 28, 2019. Instead, we decide only that the actions taken here were sufficient to constitute such, and we reject Mother's and Maternal Grandmother's arguments that section 263.401(a) requires more.[18]

Accordingly, we conclude trial on the merits commenced on January 28, 2019 in compliance with section 263.401(a), and we overrule Mother's and Maternal Grandmother's first issues.

### *Mother's and Maternal Grandmother's Evidentiary Challenges*

In her second issue, Mother argues the evidence was legally and factually insufficient to support the trial court's determination that it was in H.B.C.'s best interest to terminate her parental rights.[19]

In Maternal Grandmother's fifth and most weighty issue, she argues the trial court abused its discretion, because of the insufficiency of the evidence, in finding that it would not be in H.B.C.'s best interest to grant Maternal Grandmother managing conservatorship of H.B.C., but, instead, that it was in his best interest to grant managing conservatorship to the Department.

In three other issues, Maternal Grandmother attacks the evidentiary support for the subsidiary findings by the trial court that she (1) neglected H.B.C.'s medical needs, (2) failed to

---

[18] We also reject Maternal Grandmother's argument that trial did not commence until May 28, 2019 because that is when the trial court invoked the rule. *See* Tex. R. Evid. 614. We do so because invoking the rule is optional, not required, and may never even occur in a particular trial. When the rule is invoked, it need not be done at any particular time in the trial, except that it must be invoked upon a party's request. *Id.* While invoking the rule may indicate that a trial has commenced, the lack of its invocation at a particular time does not indicate trial has not commenced. Here, during the proceedings on January 28, 2019, counsel for the Department expressed a desire to invoke the rule, and as a result of that request, on May 28, 2019, when trial resumed, the trial court ordered witnesses excluded from the courtroom so that they could not hear other witnesses' testimony. That the trial court waited until May 28, 2019 to implement the rule does not, on the facts of this case, change that trial on the merits commenced on January 28, 2019.

[19] Mother has challenged the trial court's finding on the "best interest" question, not its findings on the grounds for termination of her rights under section 161.001(b)(1). *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O), (P).

recognize H.B.C.'s special needs, and (3) had a significant CPS history that included removal of two of her children from her care.[20]

### 1. Mother's Evidentiary Challenge

In her second issue, Mother argues the evidence was legally and factually insufficient to support the court's determination that it was in H.B.C.'s best interest to terminate her parental rights.

As we noted earlier, a trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that (1) one or more of the statutory grounds for termination enumerated in the Texas Family Code has been established; and (2) termination is in the child's best interest. TEX. FAM. CODE § 161.001(b); *see also In re T.C.*, No. 05-19-00262-CV, 2019 WL 3852657, at *5 (Tex. App.—Dallas Aug. 16, 2019, pet. denied) (mem. op.). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

Our standards of review on appeal reflect the elevated burden of proof at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas 2013, pet. denied). Both legal sufficiency and factual sufficiency reviews require us to review the evidence to determine whether the factfinder reasonably could have formed a firm belief or conviction that the grounds for termination were established. *See In re J.F.C.*, 96 S.W.3d at 265–66; *In re L.E.H.*, No. 05-18-00903-CV, 2018 WL 6839565, at *4 (Tex. App.—Dallas Dec. 31, 2018, no pet.) (mem.

---

[20] We note that Maternal Grandmother is appearing pro se in this appeal. At trial, she was represented by counsel. While we construe her briefing liberally, a pro se litigant like Maternal Grandmother is nevertheless held to the same standards as a licensed attorney in the need to comply with rules and procedures. *Amrhein v. Bollinger*, No. 05-18-00567-CV, 2019 WL 4875347, at *2 (Tex. App.—Dallas Oct. 3, 2019, no pet. h.).

op.). The difference between the two reviews lies primarily in the manner in which we consider evidence contrary to a finding. *See In re A.C.*, 560 S.W.3d at 630.

In considering legal sufficiency, we look at the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable fact-finder could have formed a firm belief or conviction that the finding was true. *Id.* at 631; *In re J.F.C.*, 96 S.W.3d at 266. If a reasonable factfinder could have done so, the evidence is legally sufficient. *In re A.C.*, 560 S.W.3d at 631.

In considering factual sufficiency, we look at the entire record. *Id.* We will reverse and set aside the trial court's findings only if they are so contrary to the overwhelming weight of the evidence such that they are clearly wrong and unjust. *In re S.V.*, 2019 WL 516730, at *7 (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam)).

A judicial determination of the "best interest" of a child "is not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm." *In re M.J.P.*, No. 05-16-01293-CV, 2017 WL 655955, at *6 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op.). Rather, "best interest" is "a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *Id.* (*quoting In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (orig. proceeding)); *see also In re C.R.*, 263 S.W.3d 368, 375 (Tex. App.—Dallas 2008, no pet.) ("[P]arental rights may not be terminated merely because a child might be better off living elsewhere.").

In determining best interest, a fact-finder may consider evidence establishing the grounds for termination under section 161.001(b)(1) and a variety of several other non-exclusive factors, where applicable, such as (1) the child's age and physical and mental vulnerabilities; (2) the child's desires; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child is fearful of living in or returning to the child's home; (5) whether the perpetrator of the harm

is identified; (6) the parental abilities of the person seeking custody; (7) the programs available to assist those persons in promoting the best interest of the child; (8) the plans for the child by those individuals or by the agency seeking custody; and (9) the stability of the home or proposed placement. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re I.S.*, 2019 WL 6696037, at *8; *see* TEX. FAM. CODE § 263.307(b) (setting forth 13 factors to consider relating to the child's best interest).

Here, the evidence and unchallenged trial court findings establish that Mother knowingly placed or allowed H.B.C., an extremely vulnerable child, to remain in conditions or surroundings which endangered his physical or emotional well-being; engaged in conduct or knowingly placed H.B.C. with persons who engaged in conduct which endangered his physical well-being; failed to comply with provisions of a court order that specifically established actions necessary for Mother to obtain H.B.C.'s return from the Department's temporary managing conservatorship; and used controlled substances in a manner that endangered the health or safety of H.B.C., and failed to complete a court-ordered substance abuse treatment program. These unchallenged statutory grounds for termination are significant to our review of the trial court's best-interest analysis, but they are not alone necessarily determinative. We also take account of the evidence before the trial court going to the non-exhaustive list of factors set forth in Texas Family Code section 263.307(b) and *Holley*, 544 S.W.2d at 371–72, to determine whether the trial court's best-interest finding is supported by that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.

H.B.C. is a child with a multitude of critical medical needs. Mother, herself, admits that she is unable to care for him and that she entrusted him to Maternal Grandmother, who has a previous felony conviction for child endangerment, a past drug problem, believes her internet-based assessment of H.B.C.'s medical conditions and needs is superior to those of H.B.C.'s

doctors, routinely neglects H.B.C.'s medical needs, and two of whose own children, including Mother, were removed from her care on a previous occasion by the Department. Mother has an unstable home, has been in altercations with Maternal Grandmother that led to Mother being placed on probation, and continued her use of drugs during the pendency of this suit and until a few months before she testified. For much of H.B.C.'s early life, Mother was out of the picture entirely, living with a friend or out of state with an ex-boyfriend. She has little understanding of H.B.C.'s critical needs and has even declined to assist in certain aspects of his care. All in all, the evidence establishes that H.B.C.'s environment is an ongoing threat to his physical safety and well-being.

We need not further prolong the accounting of evidence that supports the trial court's determination. We conclude that the evidence before the trial court was legally and factually sufficient, such that a reasonable factfinder could have formed a firm belief or conviction that it was in H.B.C.'s best interest to terminate Mother's parental rights.

We overrule Mother's second issue.

### 2. Maternal Grandmother's Evidentiary Challenge

Maternal Grandmother argues that the trial court abused its discretion by determining it was in H.B.C.'s best interest to appoint the Department, and not her, as H.B.C.'s managing conservator because there is insufficient evidence to support that determination.

In related issues, Maternal Grandmother argues the trial court erred in making various subsidiary findings that she neglected and failed to recognize H.B.C.'s special medical needs, and that she had significant history with the Department.

As we have noted, legal and factual sufficiency are not independent grounds of error in conservatorship issues but are relevant in considering whether an abuse of discretion occurred. *In re L.W.*, 2016 WL 3960600, at *2. In deciding whether an abuse of discretion occurred on a

conservatorship issue, we consider whether the court (1) had sufficient evidence upon which to exercise its discretion and (2) erred in its exercise of that discretion. *Id.* We apply the applicable sufficiency review on the first question, and on the second, we consider whether, based on the evidence, the trial court made a reasonable decision. *Id.*

There is no need to recount here the evidence outlined above. Charitably, Maternal Grandmother's approach to H.B.C. may be fairly characterized as one of conscious disregard of, if not deliberate indifference to, his well-being. Here, we conclude that the trial court had legally and factually sufficient evidence upon which to exercise its discretion on the issue, and that based on a preponderance of that evidence, the trial court made a reasonable decision.

The trial court did not abuse its discretion in failing to name Maternal Grandmother, rather than the Department, H.B.C.'s managing conservator. We overrule Maternal Grandmother's second, third, fourth, and fifth issues.

### *Issues First Raised in Maternal Grandmother's Reply*

In addition to the issues we have overruled, Maternal Grandmother raises at least four other issues in her reply brief that she did not raise before, including but not limited to arguments that the court's order violates the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution. We do not consider issues raised for the first time in an appellant's reply brief and thus do not address those issues here. *See City of San Antonio v. Schautteet*, 706 S.W.2d 103, 104 (Tex. 1986) (per curiam) (court of appeals should not have addressed the constitutional challenge raised for the first time in a reply brief on appeal); *Clark v. Litchenburg*, No. 05-18-00278-CV, 2019 WL 4010771, at *5 n.2 (Tex. App.—Dallas Aug. 26, 2019, no pet.) (mem. op.) (citing *St. John Missionary Baptist Church v. Flakes*, 547 S.W.3d 311, 316 (Tex. App.—Dallas 2018, pet. pending) (en banc)); *Powell v. Knipp*, 479 S.W.3d 394, 408 (Tex. App.—Dallas 2015, pet. denied); TEX. R. APP. P. 38.3.

## IV. CONCLUSION

We affirm the trial court's judgment.

/Ken Molberg//
KEN MOLBERG
JUSTICE

190907f.p05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN RE: IN THE INTEREST OF H.B.C., A CHILD

No. 05-19-00907-CV

On Appeal from the 397th Judicial District Court, Grayson County, Texas
Trial Court Cause No. FA-17-1672.
Opinion delivered by Justice Molberg. Justices Myers and Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 23rd day of January 2020.