

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00389-CV

_____

ACCLAIM PHYSICIAN GROUP, INC., Appellant

V.

KIERRA WRIGHT AND DOMONIQE JACKSON, Appellees

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-326748-21

Before Kerr, Birdwell, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

This is an accelerated interlocutory appeal in a medical negligence case. Appellant Acclaim Physician Group, Inc. (Acclaim) appeals the trial court's denial of its motion to dismiss Dr. Jacqueline Garda from the suit filed pursuant to Section 101.106(e) of the Texas Tort Claims Act (TTCA). We will reverse the trial court's order and render judgment dismissing Garda from the suit. Tex. R. App. P. 43.2(c).

## I. BACKGROUND

### A. APPELLEES SUE

Garda is a licensed obstetrician who delivered Appellees Kierra Wright and Domoniqe Jackson's baby at Texas Health Harris Methodist Hospital Fort Worth (Harris Hospital) in July 2019. After the baby suffered injuries to its shoulder during delivery, Appellees sued Acclaim, Garda, Harris Hospital, and nurse Stephanie Herbert for negligence.[1] Appellees' petition alleged that at all material times:

- "[Harris Hospital and Acclaim were] vicariously liable for the negligent conduct of their physicians . . . and/or employees under the doctrine of *respondeat superior*";

- "[Garda] was an agent, representative, or employee or apparent or ostensible agency [sic] of [Acclaim];

- "[Garda] was acting within the course and scope of her employment, or ostensible agency with [Acclaim]; and

_____

[1]Acclaim is the only Appellant to this appeal.

2

- [Harris Hospital] and/or [Acclaim] are responsible and vicariously liable for the injuries and damages caused by the negligence of [Garda];

## B. ACCLAIM MOVES TO DISMISS GARDA

Acclaim filed a motion to dismiss under Section 101.106(e) of the TTCA, arguing that Garda should be dismissed from the suit because Acclaim was a governmental unit and Garda had been acting as its employee when she delivered Appellees' baby at Harris Hospital. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.106(e) (providing that, in a suit filed under the TTCA against a governmental unit and any of its employees, the "employees shall immediately be dismissed on the filing of a motion by the governmental unit").

First, Acclaim argued that it was a governmental unit on two independent bases: (1) as a charitable organization formed by Tarrant County Hospital District d/b/a John Peter Smith Hospital (JPS) and (2) as a hospital district management contractor. *See* Tex. Health & Safety Code Ann. §§ 281.0565(b), 281.072.

Acclaim asserted that it was a nonprofit organization formed in 2015 by two members: JPS and the University of North Texas Health Science Center at Fort Worth (UNTHSC).[2] As evidence of this, Acclaim attached to its motion a copy of its Certificate of Formation (Certificate) and a letter from the Texas Medical Board certifying that Acclaim was "a non-profit health organization." The Certificate

---

[2]According to Acclaim, UNTHSC is no longer a member of Acclaim, leaving JPS as its sole member.

3

provided that Acclaim's purposes were "exclusively charitable, educational, and scientific within the meaning of section 501(c)(3) of the Internal Revenue Code." It further provided that Acclaim would operate "exclusively to benefit" its members by

> engaging in scientific research and research projects in the public interest in the fields of medical sciences, medical economics, public health, sociology, and related areas; providing, improving, and developing capabilities of and support for individuals and institutions studying, teaching, and practicing medicine; delivering health care to the public; improving population health and care management and engaging in the instruction of the general public in the area of medical science, public health, and hygiene and related instruction useful to the individual and beneficial to the community; and engaging in other activities useful or appropriate to the accomplishment of the foregoing purposes.

According to Acclaim, after its formation it entered into a professional services agreement (PSA) with JPS that was in effect when Garda delivered Appellees' baby. Concerning the PSA[3] and Acclaim's alleged status as a hospital district management contractor, Daphne Walker, JPS's senior vice president and chief legal counsel, attested as follows:

- "Acclaim provides services under [the PSA] with JPS and is thus a 'hospital district management contractor' pursuant to Texas Health and Safety Code § 285.071";

- "The [PSA] requires Acclaim to provide medical services to JPS's patients and provide medical staff services for the sole benefit of JPS, oversee administration and management of JPS department operations, designate a physician from its staff a 'Department Chair' for each JPS department who oversees and assumes responsibility for operating and managing the department, provide administrative and management

---

[3]A copy of the PSA does not appear in the record.

4

services to JPS in its various departments, assist JPS in developing, implementing, monitoring, and reviewing JPS's quality assurance and improvement, utilization review, and peer review programs, procedures, guidelines, and policies, and manage various JPS departments and/or service lines in a manner that meets JPS's expectations with respect to quality, compliance, performance, and patient/physician satisfaction";

- "The [PSA] was in effect at the time of the care . . . at issue in this case. The care, though having taken place at [Harris Hospital], was provided in accordance with the PSA and for the benefit of JPS"; and

- "Any employee of Acclaim performing services for the benefit of JPS is considered an employee of JPS for purposes of Chapters 101, 102, and 108 of the Texas Civil Practice and Remedies Code."

To support its contention that Garda was acting as an Acclaim employee when she delivered Appellees' baby at Harris Hospital, Acclaim proffered (1) Garda's affidavit, (2) a billing record for the baby's delivery, (3) a Harris Hospital patient consent form purportedly signed by Wright, and (4) a Medical Coverage Services Agreement between Harris Hospital and Acclaim (Harris–Acclaim Agreement).

In her affidavit, Garda attested that, at the time of the care in question, she "was an employee of [Acclaim], was solely employed by Acclaim, and was not employed by any other [entity] other than Acclaim." The billing record is a one-page, itemized statement showing certain charges billed by Acclaim for services rendered by Garda in the baby's delivery. The Harris Hospital patient consent form is a document apparently signed by Wright[4] by which she acknowledged that her treating physicians

_____

[4]In the record copy of this form, the signature block is mostly obstructed and shows only a partial signature, though there is other identifying information on the

5

"[did] not work for [Harris] Hospital[,] . . . that [Harris] Hospital [was] not responsible for their judgment or conduct," and that they "practice[d] independently and [were] not employees or agents of [Harris] Hospital."

The Harris–Acclaim Agreement outlined that Harris Hospital needed physicians to provide obstetrics services to its patients and that Acclaim "employ[ed] or contract[ed] with physicians on [Harris] Hospital's medical staff." Harris Hospital agreed to pay Acclaim to provide it with obstetrics services using these Acclaim physicians. Under the Agreement, Acclaim was obligated to

- ensure that its physicians held the appropriate professional qualifications, which included maintaining membership on Harris Hospital's medical staff;

- "make available" the physicians Acclaim employed or contracted with to provide round-the-clock obstetrics services to Harris Hospital;

- furnish Harris Hospital with a monthly schedule of the physicians that Acclaim intended to provide these services;

- remove from the schedule physicians that Harris Hospital refused for cause; and

- ensure that Acclaim and its physicians complied with Harris Hospital's policies and procedures.

  And Harris Hospital was obligated to

- provide the facilities and equipment necessary for the provision of the obstetrics services, except that it was not responsible for paying "the personal and professional expenses" of Acclaim's physicians; and

---

form indicating that the form was related to Wright's care at Harris Hospital. Appellees did not object to the exhibit.

- provide nursing and other administrative staff necessary for providing obstetrics services, "the selection, retention, direction[,] and control" of which at all times remained with Harris Hospital.

Under the Harris–Acclaim Agreement, Harris Hospital would pay Acclaim a set amount per each twenty-four-hour period of obstetrics services provided by Acclaim physicians. Acclaim was "solely responsible" for directly billing any patients for treatment they received from Acclaim physicians at Harris Hospital. And it was agreed that Harris Hospital would make no withholdings for Acclaim physicians for "any sum for federal income tax, unemployment insurance, social security, or any other withholding applicable to employees." Further, Harris Hospital would not provide Acclaim or any of its physicians "any of the benefits provided to [Harris] Hospital's employees." All such payments, withholdings, and benefits were "the sole responsibility" of Acclaim, which would "indemnify and hold harmless" Harris Hospital from any liability related thereto.

Regarding the relationship between Acclaim physicians and Harris Hospital, the Harris–Acclaim Agreement provided as follows:

> Each [Acclaim] [p]hysician, as a medical staff member, shall have the rights, privileges[,] and responsibilities set forth in [Harris] Hospital's Medical Staff Bylaws. Provided, however, each [Acclaim] [p]hysician's exercise of medical staff privileges applicable to the [obstetrics services] will be contingent upon such [p]hysician's continued employment or contractual relationship with [Acclaim] and the continuation of this Agreement. The ability of any [Acclaim] [p]hysician to exercise his clinical privileges at [Harris] Hospital shall automatically lapse upon . . . the cessation of his/her employment or contractual relationship with [Acclaim]; or . . . termination of this Agreement.

7

. . . .

The parties understand and agree that this Agreement . . . is not to be construed as an exclusive Agreement between [Harris] Hospital and [Acclaim] [p]hysician[s] for the provision of professional medical services within . . . [Harris] Hospital.

. . . .

In the performance of the professional medical services and responsibilities assumed by [Acclaim] under this Agreement, it is mutually understood and agreed that [Acclaim] and all [p]hysicians made available by [Acclaim] are, and at all times are, independent practitioners. [Acclaim] and [its p]hysicians shall perform the [obstetrics services] free of any direction or control by [Harris] Hospital, but in a manner consistent with currently approved methods and practices in the medical profession and in compliance with the standards of [Harris Hospital] Medical Staff and/or as otherwise provided by this Agreement. Nothing in this Agreement shall be construed as giving [Harris] Hospital the degree of control necessary to create an employer-employee relationship between [Harris] Hospital and [Acclaim], and neither [Acclaim] nor any [of its p]hysician[s] is a partner or agent of [Harris] Hospital.

Finally, under a section entitled "Insurance," it was agreed that Acclaim was "a non-profit health organization organized by [JPS]" and a "unit of local government for purposes of Chapter 101 of [the TTCA]." Additionally, "[a]s employees of a local unit of government, [Acclaim's] employed [p]hysicians f[ell] under sovereign immunity and certain limits of liability under [the TTCA] with respect to acts performed in the course and scope of employment." As such, Acclaim agreed to insure its physicians at its discretion "to address liability exposure associated with the acts and omissions of its physician employees pursuant to [Harris] Hospital's requirement for medical staff membership." And Acclaim agreed that it was

8

responsible for "any and all liability attributable to [its] employees during the performance of [obstetrics services at Harris Hospital]."

Based on this evidence, Acclaim argued that it was a governmental unit—either as a Section 281 charitable organization or as a hospital district management contractor—and that Garda had been acting within the scope of her employment for Acclaim when she delivered the baby at Harris Hospital. For these reasons, Acclaim concluded that Garda should be dismissed "immediately" upon its Section 101.106(e) motion to dismiss. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.106(e).

### C. APPELLEES RESPOND

In response, Appellees did not dispute that Acclaim was a governmental unit or that Acclaim had paid Garda for delivering their baby. Instead, they argued that the "entire basis of Acclaim's motion to [d]ismiss" hinged on whether Garda acted as Acclaim's employee while working at Harris Hospital. To support their contention that Garda had not been acting as Acclaim's employee when she delivered their baby, Appellees provided a number of documents, including: (1) an employment agreement between Acclaim and Garda (Employment Agreement); (2) testimony from Garda's deposition; (3) bylaws, rules, and regulations of the Harris Hospital medical staff (Bylaws and Rules); and (4) Harris Hospital's shoulder dystocia policy (Dystocia Policy).

Garda's Employment Agreement outlines that Acclaim hired her to provide obstetrics and gynecological services exclusively at JPS and "other sites as may be

9

approved by" JPS and Acclaim.  Garda was prohibited from engaging in the practice of medicine "except as an employee of Acclaim" unless she secured Acclaim's written authorization.  It was agreed that Garda would exercise her "own independent judgment regarding the treatment of any particular patient" and that Acclaim would not "control, attempt to control, influence, attempt to influence[,] or otherwise interfere with" Garda's independent professional judgment in diagnosing and treating patients.  Garda agreed to "observe, comply with[,] and be bound by all regulations, policies[,] and procedures of general application to individuals employed by Acclaim."

The Employment Agreement contains a liability provision similar to the one in the Harris–Acclaim Agreement—stating that Acclaim was a unit of local government for purposes of the TTCA, that Garda was therefore a government employee "for purposes of determining liability for acts/omissions within the course and scope of [her] employment," and that Acclaim would "pay for all costs of suit and legal representation related to claims against [her]" related to such acts or omissions.[5]  As Acclaim's employee, Acclaim would pay Garda, withhold taxes, and provide her with all "benefits available to Acclaim employees."  Garda was prohibited from billing or collecting from patients directly and agreed that if she received payment from any

---

[5]The issue of liability appears twice in the Employment Agreement—once in the main body of the text and again as part of an exhibit attached to the Agreement—using substantially similar language each time.  The language in the exhibit adds that, in the event that Garda is determined to have been working as Acclaim's employee when she committed the acts or omissions underlying a suit in which she is named as a party, Acclaim would assert that she should be personally dismissed.

10

source for services provided under the Employment Agreement, she would submit such payment to Acclaim. Garda also agreed to a one-year nonsolicitation agreement upon termination of her employment with Acclaim.

The Employment Agreement also discusses the issue of Garda's potential assignment to other entities:

> At Acclaim's discretion, [Garda] may be assigned, leased[,] or subcontracted to perform services at or on behalf of other entities. In such instance, [Garda] understands and acknowledges that [she] will be required to follow, abide by[,] and comply with such entity's policies, procedures, bylaws, compliance programs[,] and other directives, as if such entity were [her] employer . . . . In the event [Garda] is assigned, leased[,] or subcontracted to perform services at or on behalf of other entities . . . the entity to which [she] is assigned, leased[,] or subcontracted . . . shall stand in the shoes of Acclaim with respect to the duties and obligations hereunder, except as and to the extent otherwise agreed between Acclaim[] and the entity receiving [Garda's] services through the assignment, lease[,] or subcontract. Acclaim, however, shall remain ultimately responsible to ensure that [Garda] receives compensation and benefits in accordance with the terms of this Agreement.

The Bylaws and Rules set out certain requirements for obtaining and maintaining Harris Hospital admitting privileges and medical staff membership.[6] All staff members must abide by Harris Hospital's Bylaws, Rules, and policies. This includes guidelines about administering medications, keeping accurate medical records that meet specific practice-area criteria,[7] participating in continuing education

---

[6]The record contains only a portion of the Bylaws and Rules.

[7]For example, obstetrical records must include "a complete prenatal record" and be updated within 24 hours of each visit.

11

programs, and providing medical care to Harris Hospital patients "as requested by [the staff member's] division chief." The portion of the Bylaws contained in the record discusses four classes of staff membership—courtesy staff, consulting staff, emeritus staff, and affiliate staff—each with varying qualification requirements. Courtesy staff, for example, are required to "take emergency room call" in certain situations and are entitled to exercise clinical privileges at Harris Hospital "subject to any contractual arrangements" that may exist. All four classes are required to "fulfill the conditions and responsibilities" of medical staff membership.

The Dystocia Policy is a step-by-step guide for Harris Hospital's labor-and-delivery unit to use as "guidance regarding the care of the intrapartum patient experiencing shoulder dystocia during delivery." By its terms, the Dystocia Policy "is not intended as a substitute for the clinician's judgment and/or experience." And the Policy specifically provides that

> [t]he physicians on the medical staff of the hospital are practitioners independent of [Harris Hospital] unless they are practitioners participating in the care of patients as part of a post-graduate medical education program. They are not agents, servants[,] or employees of [Harris Hospital] unless they are part of a graduate medical education program of [Harris Hospital]."

In her deposition, Garda confirmed that, though she may have delivered "slightly more" babies at Harris Hospital in 2019 than at JPS, she only ever acted as "a salaried physician with Acclaim." She agreed that she was required to follow the Dystocia Policy when delivering Appellees' baby at Harris Hospital, with the

12

understanding that the Policy was only a guideline and not a substitute for her "clinical judgment."

## II. DISCUSSION

### A. JURISDICTION

We begin with a discussion about our jurisdiction. *See Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 526 S.W.3d 693, 698 (Tex. App.—Houston [14th Dist.] 2017) (explaining that appellate courts must examine jurisdiction "independently and sua sponte" if necessary), *aff'd*, 571 S.W.3d 738 (Tex. 2019); *In re M.G.T.*, No. 02-10-00340-CV, 2011 WL 255542, at *1 (Tex. App.—Fort Worth Jan. 27, 2011, no pet.) (mem. op.) (same).

Acclaim argues that our jurisdiction lies under Section 51.014(a)(5) of the Texas Civil Practice and Remedies Code, which provides that a party may appeal an interlocutory order that "denies a motion for summary judgment that is based on an assertion of immunity by an individual who is an officer or employee of the state or a political subdivision of the state." Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(5). Appellees contend that we lack jurisdiction under this provision because Garda had not been acting as an employee of the state or a political subdivision of the state when she delivered the baby.

We conclude that we have jurisdiction over this appeal—though under Section 51.014(a)(8)—based on Acclaim's status as a charitable organization formed by JPS. *Id.* § 51.014(a)(8). Section 51.014(a)(8) creates appellate jurisdiction from an

interlocutory order that "grants or denies a plea to the jurisdiction by a governmental unit as that term is defined in Section 101.001." *Id.* The supreme court has held that Section 51.014(a)(8) appeals are not limited to any single procedural vehicle (*i.e.* a plea to the jurisdiction) and may lie upon the denial of any motion that challenges the trial court's subject matter jurisdiction. *Thomas v Long*, 207 S.W.3d 334, 339–40 (Tex. 2006); *see Austin State Hosp. v. Graham*, 347 S.W.3d 298, 300–01 (Tex. 2011). This includes the denial of motions brought by governmental units to dismiss their employees pursuant to Section 101.106(e) of the TTCA, as Acclaim brought here. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.106(e); *Graham*, 347 S.W.3d at 301.

Thus, our jurisdiction hinges on whether Acclaim was a governmental unit when it brought its motion to dismiss.

Section 101.001 defines a governmental unit as, among other things, "any other institution, agency, or organ of government the status and authority of which are derived from the Constitution of Texas or from laws passed by the Legislature under the constitution." Tex. Civ. Prac. & Rem. Code Ann. § 101.001(3)(D). This definition is broadly applicable, with the phrase "organ of government" encompassing "an entity that operates as part of a larger governmental system." *Univ. of the Incarnate Word v. Redus*, 518 S.W.3d 905, 910 (Tex. 2017); *see Eckerd Youth Alts., Inc. v. Pytel*, No. 02-21-00332-CV, 2022 WL 2176523, at *3 (Tex. App.—Fort Worth June 16, 2022, no pet.) (mem. op.).

14

As a charitable organization formed by JPS under Section 281.0565 of the Health and Safety Code, Acclaim falls within this broad definition of governmental unit. *See* Tex. Health & Safety Code Ann. § 281.0565(b). Section 281.0565 allows a hospital district such as JPS to "create a charitable organization to facilitate the management of a district health care program by providing or arranging health care services, developing resources for health care services, or providing ancillary support services for the district." *Id.* Importantly, for our purposes, "[a] charitable organization created by a district under this section *is a unit of local government* only for purposes of Chapter 101, Civil Practice and Remedies Code." *Id.* § 281.0565(c) (emphasis added).

The record further establishes that Acclaim operates "as a part of" JPS, a larger governmental system.[8] *See Redus*, 518 S.W.3d at 910. Acclaim was created and organized by JPS to operate "exclusively to benefit" JPS. Further, Walker attested—and Appellees do not dispute—that Acclaim provides specific operating, management, and administrative services to JPS and medical care to JPS patients "for the sole benefit of JPS." And Acclaim derived its existence and status as "a unit of local government" from laws passed by the legislature that enable hospital districts to

---

[8]JPS is a political subdivision of the State of Texas. *Tarrant Cnty. Hosp. Dist. v. GE Auto. Servs., Inc.*, 156 S.W.3d 885, 891 (Tex. App.—Fort Worth 2005, no pet.).

15

create charitable organizations to help "facilitate the management" of those districts.[9] *See* Tex. Health & Safety Code Ann. §§ 281.0565(b), (c).

For these reasons, we hold that Acclaim is a governmental unit and that we have jurisdiction to review—as a Section 51.014(a)(8) interlocutory appeal—the trial court's denial of Acclaim's Section 101.106(e) motion to dismiss. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8).

## B.  TRIAL COURT ERRED BY DENYING ACCLAIM'S MOTION

In its sole issue, Acclaim argues that its Section 101.106(e) motion to dismiss Garda should have been granted because the record established that it is a governmental unit and that Garda was its employee when she delivered Appellees' baby at Harris Hospital.  Appellees argue that the trial court did not err because Acclaim was not a governmental unit and because Garda had not been acting as Acclaim's employee, both of which would preclude her dismissal.  We agree with Acclaim.

---

[9]We are not alone in holding that a Section 281 charitable organization such as Acclaim (or a similar corporation) is a governmental unit. *See Cmty. Health Choice, Inc. v. ACS Primary Care Physicians Sw., P.A.*, No. 14-21-00519-CV, 2023 WL 5208809, at *2 (Tex. App.—Houston [14th Dist.] Aug. 15, 2023, no pet. h.) ("Therefore, Community Health [a Section 281 charitable organization] is a governmental unit for purposes of the interlocutory appeal permitted by section 51.014(a)(8)."); *see Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 748 (Tex. 2019) (holding same for economic development corporations created under similar statute).  Nor are we the first court to conclude that Acclaim itself is a governmental unit owing to its status as a Section 281 charitable organization. *See DePaz Gonzalez v. Duane*, No. 4:20-CV-072-A, 2022 WL 743521, at *5 (N.D. Tex. Mar. 11, 2022) (mem. op.) ("Acclaim is a governmental unit under Texas law.").

### 1. Standard of Review and Relevant Law

We review de novo a trial court's ruling on a motion to dismiss brought under Section 101.106(e) of the TTCA. *Crockett Cnty. v. Damian*, 622 S.W.3d 58, 60 (Tex. App.—El Paso 2020, no pet.); *City of Webster v. Myers*, 360 S.W.3d 51, 56 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). Such a motion must be granted if no fact issue exists as to the governmental unit's entitlement to have its employee dismissed. *See Marino v. Lenoir*, 526 S.W.3d 403, 405 (Tex. 2017); *Baylor Scott & White v. Peyton*, 549 S.W.3d 242, 245–46 (Tex. App.—Fort Worth 2018, no pet.); *Powell v. Knipp*, 479 S.W.3d 394, 398 (Tex. App.—Dallas 2015, pet. denied).

The TTCA's election-of-remedies provision was adopted as a means of "reducing the resources that the government and its employees must use in defending redundant litigation and alternative theories of recovery." *Mission Consol. ISD v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008). It provides in pertinent part:

> (a) The filing of a suit under this chapter against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter.
>
> (b) The filing of a suit against any employee of a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against the governmental unit regarding the same subject matter unless the governmental unit consents.
>
> . . . .

> (e) If a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit.

Tex. Civ. Prac. & Rem. Code Ann. §§ 101.106(a), (b), (e).

Accordingly, a plaintiff must decide "at the outset whether an employee acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable." *Garcia*, 253 S.W.3d at 657. This decision is "an irrevocable election" made "at the time suit is filed." *Id.* Further, "the expedient dismissal" of governmental unit employees is preferred and courts must, therefore, "favor a construction that most clearly leads to the early dismissal of a suit against an employee when the suit arises from an employee's conduct that was within the scope of employment and could be brought against the government under the TTCA." *Tex. Adjutant Gen.'s Off. v. Ngakoue*, 408 S.W.3d 350, 355 (Tex. 2013).

When, as here, a plaintiff sues both the governmental unit and the employee, the governmental unit may file a motion to dismiss the claims against its employee. Tex. Civ. Prac. & Rem. Code Ann. § 101.106(e). The election-of-remedies provision is triggered as soon as the governmental unit files a Section 101.106(e) motion to dismiss. *Univ. of Tex. Health Sci. Ctr. at Hous. v. Rios*, 542 S.W.3d 530, 538 (Tex. 2017); *Damian*, 622 S.W.3d at 61. "By filing such a motion, the governmental unit effectively confirms the employee was acting within the scope of employment and that the government, not the employee, is the proper party." *Ngakoue*, 408 S.W.3d at 358;

*Ledesma v. City of Hous.*, 623 S.W.3d 840, 848 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (explaining that the governmental unit is in the best position to know who its employees are when it files a Section 101.106(e) motion to dismiss). Upon the employee's dismissal, the suit "proceeds solely against the government." *Ngakoue*, 408 S.W.3d at 358.

In light of this, Garda should have been immediately dismissed from the suit upon Acclaim's motion to dismiss if no fact issues existed as to whether (1) Acclaim was a governmental unit and (2) Garda was acting as its employee, as defined by the TTCA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.106(e); *Marino*, 526 S.W.3d at 405; *Powell*, 479 S.W.3d at 398.

### 2. Acclaim is Governmental Unit Under Section 101.106

We have already held for jurisdictional purposes that Acclaim is a governmental unit because it is a Section 281.0565 charitable organization that operates as a part of JPS. *See Redus*, 518 S.W.3d at 910. We hold now, for these same reasons, that no fact issue existed as to whether Acclaim was a governmental unit for purposes of its Section 101.106(e) motion to dismiss Garda.[10]

Appellees argue that *Rosenberg* supports their contention that Acclaim is not a governmental unit for purposes of Garda's dismissal. *See* 571 S.W.3d 738 at 747.

---

[10]Having held that the record establishes Acclaim's governmental unit status on Acclaim's theory that it was a Section 281.0565 charitable organization, we need not consider its alternate theory that its governmental unit status derived from its being a hospital district management contractor. *See* Tex. R. App. P. 47.1.

19

There, the Texas Supreme Court sought to determine whether an economic development corporation (EDC)[11] was itself entitled to immunity from suit as an arm of the state. *Id.* at 741, 748. The court recognized that EDCs were in fact governmental units but ultimately held that "the Legislature did not authorize municipalities to create economic development corporations as distinct governmental entities entitled to assert immunity in their own right." *Id.* at 751.

*Rosenberg* is distinguishable from our case. We are not presented here with the issue of whether Acclaim was itself entitled to immunity from suit—a determination that would proceed under a separate analysis. *See id.* at 748–51. Instead, we are tasked with determining only whether "a suit [was] filed under [the TTCA] against both a governmental unit and any of its employees." *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.106(e). If these clearly delineated elements exist, the TTCA requires that Garda be immediately dismissed upon Acclaim's motion.[12] *See id.*

---

[11]Through the Development Corporation Act, the Legislature enabled municipalities to create EDCs for the purpose of promoting and developing enterprises that promote and encourage employment and the public welfare. Tex. Loc. Gov't Code Ann. §§ 501.004(a)(6), .051(c); *see Rosenberg*, 571 S.W.3d at 744.

[12]It is also notable that Appellees, in responding in the trial court to Acclaim's motion to dismiss, did not dispute Acclaim's status as a governmental unit. Instead, they argued that the determination of Acclaim's motion to dismiss hinged only on whether Garda was acting as Acclaim's employee at the time of delivery.

### 3. Garda Was Acclaim's Employee

### A. TTCA Employee

The record established that Garda was Acclaim's employee under the TTCA.

The TTCA defines "employee" as

> a person, including an officer or agent, who is in the paid service of a governmental unit by competent authority, but does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the legal right to control.

Tex. Civ. Prac. & Rem. Code Ann. § 101.001(2).

Appellees do not dispute that Garda was "in the paid service" of Acclaim. Instead, they contend only that Acclaim did not have the "legal right to control" the tasks that Garda performed at Harris Hospital because Harris Hospital was the entity that actually controlled her.

The Texas Supreme Court has explained that the TTCA's definition of employee "does not require that a governmental unit control *every* detail of a person's work." *Murk v. Scheele*, 120 S.W.3d 865, 867 (Tex. 2003) (rejecting argument that physician was not TTCA employee even though exercise of physician's independent judgment was outside governmental unit's right of control). Where there are two alleged employers, courts look to the contracts between the employers to determine which retains the legal right of control over the employee. *Powell*, 479 S.W.3d at 401.

A contract that explicitly allocates which entity controls the employee is typically dispositive if no contrary evidence exists. *Id.*; *see Producers Chem. Co. v. McKay*,

21

366 S.W.2d 220, 226 (Tex. 1963) ("When a contract, written or oral, between two employers expressly provides that one or the other shall have right of control, solution of the question is relatively simple."); *Skapek v. Perkins*, No. 05-16-00796-CV, 2017 WL 655950, at *3 (Tex. App.—Dallas Feb. 17, 2017, pet. denied) (mem. op.) ("A party may establish legal right to control in two ways: 1) evidence of a contract that expressly assigns the right of control or, absent a contract, 2) evidence of actual control over the manner in which the work is to be performed."); *see also Marino*, 526 S.W.3d at 408 (looking to contracts and other relevant documents to determine physician's employee status); *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 543 (Tex. 2002) (same). When faced with such express contractual provisions, the nonmovant must raise a fact issue that the second employer actually controlled the employee "to the exclusion of" the governmental unit's legal right of control. *Powell*, 479 S.W.3d at 401 (citing *White v. Liberty Eylau Sch. Dist.*, 880 S.W.2d 156, 159 (Tex. App.—Texarkana 1994, writ denied) ("A person may be the servant of two employers at one time as to one act if the service to one does not involve an abandonment of the service to the other.")); *see Wolff*, 94 S.W.3d at 408.

Garda's Employment Agreement and the Harris–Acclaim Agreement established that Garda was Acclaim's employee for TTCA purposes because Acclaim retained the legal right to control the details of her work—even work completed at Harris Hospital.

22

The Employment Agreement outlines that Garda would provide obstetrics services for Acclaim at JPS and other approved sites and that she was prohibited from practicing medicine in any capacity other than as Acclaim's employee. Acclaim would pay Garda, withhold requisite taxes, and provide her with all benefits available to her as Acclaim's employee. It was agreed that Garda was a government employee due to her employment with Acclaim, a unit of government, and that Acclaim would therefore cover all costs related to any legal claims filed against her related to her work. In the event that Garda was sued, Acclaim agreed that it would move to have her dismissed under the TTCA.

On the issue of Garda's assignment to another entity, such assignments were exclusively at Acclaim's discretion. It was agreed that Garda would follow the policies and directives of the receiving entity and that the receiving entity would "stand in the shoes of Acclaim with respect to the duties and obligations" in the Employment Agreement—*unless Acclaim and the receiving entity agreed otherwise.*

Acclaim and Harris Hospital did agree otherwise via the Harris–Acclaim Agreement. They agreed that Harris Hospital was not granted "the degree of control necessary to create an employer-employee relationship between" it and Acclaim's physicians that were assigned to Harris Hospital. Rather, all Acclaim physicians would provide their services at Harris Hospital "free of any direction or control by Harris Hospital" and would lose all clinical privileges at Harris Hospital if the physician ceased working at Acclaim.

Acclaim took responsibility for ensuring that its physicians complied with Harris Hospital's policies and procedures and that they held the appropriate professional qualifications. All salaries and benefits owed to Acclaim physicians were Acclaim's sole responsibility, and Acclaim agreed to indemnify Harris Hospital from any attendant liability. Acclaim was to set all of its physician schedules at Harris Hospital and to remove them from working at Harris Hospital if cause existed. And it was required to directly bill patients for any care they received from Acclaim physicians at Harris Hospital.

Finally, Acclaim and Harris Hospital agreed that Acclaim was a unit of local government under the TTCA and that its physicians fell under Chapter 101 of the TTCA. And they agreed that Acclaim was solely responsible for insuring its physicians and for "any and all liability attributable to [its] employees" arising out of the care they provided at Harris Hospital.

Other record evidence supports that Garda acted only as Acclaim's employee. Garda testified and attested that she had only ever been a salaried employee of Acclaim when she provided services at Harris Hospital. Additionally, Harris Hospital's own patient consent form notified patients—including Wright—that their treating physicians were not Harris Hospital employees and that Harris Hospital was "not responsible for their judgment or conduct."

Taken together, the evidence establishes that Acclaim had the legal right to control Garda as its employee while she worked at Harris Hospital, and that all

24

contractual parties proceeded under this understanding. Nothing in the record shows that Harris Hospital made any particular attempt to control Garda in the care that she provided at Harris Hospital. *See Powell*, 479 S.W.3d at 403 ("There is no evidence in the record [that the physician] obtained any directive from anyone at [the borrowing hospital] as to how [the physician] was to perform his radiological tasks pertaining to [the injured patient].").

Appellees argue that the Bylaws and Rules of the Harris Hospital Medical Staff and the Dystocia Policy raise at least a fact issue as to whether Harris Hospital— rather than Acclaim—actually controlled Garda's care related to the delivery of their baby. These arguments are unavailing.

It is not disputed that, to have staff privileges at Harris Hospital, a physician such as Garda was required to be a member of the Harris Hospital Medical Staff. It is likewise not disputed that such membership was contingent upon the physician's meeting certain qualifications and following the Bylaws and Rules. However, the law is clear that, generally, "a physician is considered to be an independent contractor with regard to hospitals at which he has staff privileges." *Dumas v. Muenster Hosp. Dist.*, 859 S.W.2d 648, 651 (Tex. App.—Fort Worth 1993, no writ) (internal quotations omitted). And independent contractors, by definition, are not employees of or controlled by the entities to which they provide services. *See Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 911 (Tex. App.—Fort Worth 2009, pet denied) ("An independent contractor is one who, in pursuit of an independent business,

25

undertakes specific work for another using his or her own means and methods without submitting to the control of the other person as to the details of the work.").[13]   In other words, the mere fact that Garda was a member of the medical staff at Harris Hospital (requiring her to follow its Bylaws and Rules) for the purpose of obtaining staff privileges there does not mean that Harris Hospital controlled her as its employee—particularly not to the exclusion of Acclaim's legal right to control her as *its* employee.

And the Dystocia Policy, rather than supporting Appellees' contention that Harris Hospital controlled Garda's actions, establishes exactly the opposite.   After outlining certain steps that labor-and-delivery practitioners should follow in the event of a shoulder dystocia event, the Dystocia Policy states that it is merely a "guideline" that should not "substitute for the clinician's clinical judgment and/or experience."   It continues by explaining that the physicians on Harris Hospital's medical staff "are practitioners independent of the hospital" unless they are part of its post-graduate education program and that they "are not agents, servants[,] or employees of [Harris Hospital] . . . ."

---

[13]Notably, in *Farlow*, we affirmed the trial court's summary judgment that ruled that a physician providing services at Harris Hospital was not its employee for respondeat superior purposes, despite the fact that the physician was required to maintain staff privileges at Harris Hospital and to abide by the Medical Staff Bylaws. *Farlow*, 284 S.W.3d at 911–17.

## B. Parties Judicially Admitted Garda Was Acclaim's Employee

Beyond the record evidence supporting Garda's status as Acclaim's employee, the parties also judicially admitted as such. The Texas Supreme Court has held that the parties' pleaded judicial admissions are dispositive in determining whether a physician is the employee of a governmental unit for dismissal under Section 101.106(e). *See Rios*, 542 S.W.3d at 534–35; *Ngakoue*, 408 S.W.3d at 358.

In *Rios*, the plaintiff alleged in his petition that a governmental-unit hospital had tortiously interfered with his residency contract "separately[] and through" certain defendant-physicians. *Rios*, 542 S.W.3d at 532. The hospital moved to dismiss the defendant-physicians under Section 101.106(e), claiming that they were hospital employees. *Id.* at 532–33. The supreme court held that the plaintiff's pleaded allegation amounted to a judicial admission as to the defendant-physicians' status as hospital employees: "Assuming Rios intended to plead a viable claim, his allegation was a judicial admission that the [hospital]'s actions through the [defendant-physicians] were through employees, relieving the defendants of having to prove that fact." *Id.* at 534.

The court then explained that the act of the governmental-unit hospital moving to dismiss its employee under Section 101.106(e) served as a judicial admission in its own right:

> In language we have recently used, "by filing such a motion, the [hospital] effectively confirmed the [defendant-physicians] were employees acting within the scope of employment and that the

27

[hospital], not the [defendant-physicians], is the proper party." Thus, at the time the defendants filed their original motion to dismiss, all parties' pleadings established that the [defendant-physicians] were [hospital] employees.

*Id.* (cleaned up) (quoting *Ngakoue*, 408 S.W.3d at 358); *see also Ramos v. City of Laredo*, 547 S.W.3d 651, 655–56 (Tex. App.—San Antonio 2018, no pet.) ("The City's assertion via its plea to the jurisdiction under Section 101.106(e) that [the employee] was entitled to official immunity amounted to a judicial admission that [the employee] was acting in the scope of employment.").

Here, the parties made similar judicial admissions. Appellees alleged in their petition that at all relevant times (1) Acclaim was vicariously liable for the negligent conduct of its employees; (2) Garda was the "agent, representative, or employee or apparent or ostensible" agent of Acclaim; (3) Garda "was acting within the course and scope of her employment, or ostensible agency with" Acclaim; and (4) Acclaim was "responsible and vicariously liable for the injuries and damages caused by the negligence of Garda." And, of course, Acclaim filed its Section 106.101(e) motion to dismiss, wherein it confirmed that Garda was acting as its employee at the delivery of Appellees' baby. Thus, as in *Rios*, the parties' pleadings here established that Garda was Acclaim's employee.

For these reasons, we hold that no fact issue existed as to whether Garda was Acclaim's employee when she delivered Appellees' baby at Harris Hospital.

## III. CONCLUSION

Having held that no fact issues existed as to whether Acclaim was a governmental unit or that Garda was its employee at all times relevant to this dispute, we sustain Acclaim's sole issue. Accordingly, we reverse the trial court's order denying Acclaim's Section 101.106(e) motion to dismiss Garda, and we render judgment dismissing Garda from the suit. *See* Tex. R. App. P. 43.2(c); *Univ. of Tex. M.D. Anderson Cancer Ctr., v. Stewart,* No. 01-16-00865-CV, 2017 WL 2590230, at *4 (Tex. App.—Houston [1st Dist.] June 15, 2017, no pet.) (mem. op.) (reversing and rendering after trial court denied Section 101.106(e) motion to dismiss).

/s/ Brian Walker

Brian Walker
Justice

Delivered: October 19, 2023

29